780 A.2d 322

**Emilia Domingo RARAS,**

v.

**STATE of Maryland.**

**No. 474, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

May 31, 2001.

Reconsideration Denied Oct. 15, 2001.

138

Clarke F. Ahlers (Carol L. James, on the brief), Columbia, for appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Marna McLendon, State's Attorney for Howard County, Ellicott City, on the brief), for appellee.

Argued before MURPHY, C.J., DEBORAH S. EYLER and PAUL E. ALPERT (Ret., specially assigned).

PAUL E. ALPERT, Judge, Retired, Specially Assigned.

A jury in the Circuit Court for Howard County convicted Emilia Domingo Raras, the appellant, of first degree murder and solicitation to commit first degree murder in the contract killing of her daughter-in-law.[1] The court imposed concurrent prison sentences of life without possibility of parole for the murder conviction and life for the solicitation conviction.

## ISSUES

In this appeal, appellant argues, in essence, that

I. The trial court erred in denying her motion to suppress her pre-trial statement to police, in that the statement was (i) taken in violation of *Miranda*[2], (ii) involuntary, and (iii) the fruit of the interrogation of another suspect conducted in violation of *Miranda*, and

II. The trial court erred by failing to adequately clarify its instruction on first degree murder in response to a question by the jury.

We find no merit in either of these arguments and affirm the judgments of the trial court.

## FACTS

On November 14, 1998, someone broke into the Howard County home of Sara Jane Williamson Raras and brutally stabbed her to death. At the time, the victim was married to but separated from appellant's son, Lorenzo Raras ("Lorenzo"). The couple had a 16 month old son, who was not in the house when the murder was committed.

Police had no real leads in the case until the following summer, when an inmate of the Baltimore County Detention Center, Edison George, informed a Baltimore County police

---

1. The jury found appellant not guilty of conspiracy to commit first degree murder.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (hereinafter referred to as simply *Miranda* ).

detective that another inmate, Ardale Tickles, had confessed to committing a murder. At the detective's suggestion, George agreed to initiate another conversation with Tickles regarding the murder and to surreptitiously tape record that conversation.

The Baltimore County police detective shared the tape recording with a Howard County police detective, Nathan Rettig, who linked Tickles' comments to the unsolved murder of Sara Raras. On August 24, 1999, Detective Rettig arrested Tickles at the Baltimore County Detention Center and transported him to a Howard County police station for interrogation.

Because the only factual disputes on appeal concern the denial of the motion to suppress, our recitation of the facts from this point on is based entirely on the evidence presented at the hearing on the motion. The parties stipulated at the hearing that, at the start of the interrogation, Tickles invoked his rights to remain silent and to counsel. On the advice of an assistant State's Attorney, however, Detective Rettig continued to interrogate Tickles. Tickles thereafter made comments that incriminated himself and appellant.

Detective Rettig immediately prepared an application for a statement of charges against appellant and obtained a warrant for her arrest. The warrant was executed that same day by Howard County Police Detectives Ellsworth Jones, Vickie Shaffer, and others. At the hearing on the motion to suppress, Detective Jones testified that appellant was arrested at her home in Baltimore County at about 2:20 PM on August 24, 1999. At the time, appellant was 63 years old. She was babysitting her grandson—the victim's son.

Detective Jones stated that he handcuffed appellant and drove her to a police station in Howard County. During the ride, appellant asked about her grandson. Detective Jones told her that another officer, Detective Shaffer, was making arrangements for the child. Detective Jones informed appellant that the police had obtained evidence against her and that she was being charged with conspiracy and solicitation to

commit murder. According to the detective, appellant said something to the effect of "I couldn't have done that." The detective then told appellant that she would be advised of her rights when they reached the station, and instructed her not to say anything further. Detective Jones recalled telling appellant that he "didn't want to hear her lying. . . ." He advised her to "focus her attention on the future of her grandchild." The detective remarked that the officers needed to find out if anyone else was involved in the murder. In particular, they wanted to know if Lorenzo was involved because, if he was, the grandson could not be returned to him.

Upon arriving at the station at 3:00 to 3:15 PM, Detective Jones placed appellant in an interview room and removed her handcuffs. The detective left appellant alone in the room for five to ten minutes, then he and Detective Glen Case joined her. One of the officers placed a photograph of Tickles on the table, and Detective Jones began what he described as "[l]aying the foundation" for an interview.[3] He informed appellant that the police knew that Tickles had killed the victim and that appellant had hired him. He reiterated that appellant was being charged with conspiracy and solicitation to commit murder. Detective Jones further reiterated that he wanted to know whether appellant's son Lorenzo was involved. The detective stated that, if Lorenzo was involved, appellant's grandson would not be returned to him.

Appellant indicated that she wanted to speak with an attorney. Through questioning, Detective Case established that appellant was sober and understood the English language.[4]

---

**3.** Most of what transpired in the interview room during this time was recorded on audiotape and transcribed, and the transcript was admitted into evidence at the suppression hearing. The tape recorder was controlled by some unidentified person outside the interview room and was turned off before the conversation was completed, however. The State was unable to explain at the hearing why the tape was terminated prematurely. Detectives Jones and Case both testified as to what transpired in the room while the tape was off.

**4.** Appellant testified at the hearing on the motion to suppress that she is a native of the Philippines but has lived in the United States since 1989.

Appellant indicated that she was diabetic and had not taken her medication that day but did not require it at that time. Detective Case then fully advised appellant of her right to counsel and her right to remain silent, and at 3:30 PM appellant filled out and signed an advice of rights form, indicating that she would not waive her rights. Detective Jones instructed appellant not to say anything further.[5]

After the advice of rights form was completed, Detective Jones reiterated that the police knew about Tickles and had enough evidence to charge appellant with conspiracy and solicitation to commit murder. Detective Case then placed on the table a photograph of the victim's body at the crime scene[6], and stated to appellant: "This is what your money paid for." Appellant glanced at the photo and immediately turned her head away. Detective Case then picked up the photo and left the room.

Appellant asked Detective Jones if she could call her family to let them know where she was. Detective Jones informed appellant that she could not do so at that time "[b]ecause the investigation was ongoing, interviews were still being made, a wiretap was attempting to be obtained; and a phone call I would have no control over would possibly hurt the investigation, so it was not to be allowed." The detective then left the interview room to arrange for the processing of appellant.

Detective Jones returned to the interview room with Detective Diana Peters at 3:45 PM. Appellant was again handcuffed, and the two detectives walked with her to the booking area. Detective Jones testified that appellant "asked about the

---

She explained that she obtained a masters degree in the Philippines at an English-language university, and that upon moving to the United States she obtained a nursing certificate from Union Memorial Hospital.

5. It was at this point that the tape of the first interview ended.

6. Appellant testified at the hearing that Detective Case placed the photograph on the table when he first entered the room. Appellant stated that the detective put the photo away, then later placed it on the table a second time.

process of getting a lawyer." He recalled that he "explained to her that she was going to be processed now, fingerprinted, photographed and placed into a cell; that she would more than likely be able to obtain a lawyer but I couldn't allow her to make any phone calls now because there was an ongoing investigation, and that eventually she would be allowed to make a phone call...." Another police officer who overheard the conversation between Detective Jones and appellant testified that Detective Jones made clear to appellant that "she would be given a phone call, but not right at that moment, but somewhere later in the processing time, she would be allowed a phone call."

According to Detective Jones, Detective Peters, and the other officer who overheard the conversation, appellant informed Detective Jones that she wanted to speak with him to "clarify" something regarding the charges. Detective Jones told appellant that he could not speak with her because she had invoked her right to counsel. Appellant continued to insist that she wanted to talk, and Detective Jones suggested that she go into a cell and think about it more. Appellant declined to do so and repeated her request, so Detective Jones finally agreed to talk.

Detectives Jones and Peters went back to the interview room with appellant.[7] Detective Jones recounted that appellant had earlier invoked her right to counsel, that he had been prepared to begin booking procedures, but that appellant had asked to speak with him. The transcript of the audio tape of the discussion reflects that Detective Jones and appellant further recounted what had happened in the booking area as follows:

> DET E. JONES NOW I TOOK YOU BACK TO THE CELL TO PUT YOU IN THE CELL. AND YOU ASKED ME ABOUT A LAWYER. ABOUT WHAT THE CIRCUMSTANCES WERE. AND I TOLD YOU THAT I

---

7. An audio tape recording began shortly after the detectives entered the room with appellant. A transcript of the tape was introduced into evidence at the hearing on the motion to suppress.

WILL NOT HIRE A LAWYER FOR YOU. I WILL NOT CALL A LAWYER FOR YOU. THAT THAT IS YOUR OBLIGATION TO DO THAT. THAT I WOULD PUT YOU IN A CELL AND EVENTUALLY YOU CAN GET A PUBLIC DEFENDER. YOU CAN DO WHATEVER YOU WANT. BUT I'M NOT DOING THAT FOR YOU.

EMILIA RARAS UM HM.

DET E. JONES AT THAT POINT YOU TOLD ME THAT THERE WAS SOME THINGS THAT YOU WANTED TO TELL ME.

EMILIA RARAS THAT THERE WAS.

DET E. JONES AND THAT I WASN'T, I TOLD YOU THAT I DID NOT WANT TO SPEAK WITH YOU ABOUT THIS. BECAUSE YOU WERE ASKING FOR AN ATTORNEY. IT'S YOUR OBLIGATION TO TALK TO ME IF YOU WANT TO TALK TO ME BUT I'M GONNA PUT YOU IN A CELL. IS THIS TRUE? WHAT WE HAD DISCUSSED?

EMILIA RARAS IT'S TRUE.

DET E. JONES SO AFTER WE DID THAT, YOU SAID THAT YOU STILL WANTED TO CLEAR UP A COUPLE OF THINGS.

EMILIA RARAS UM HM.

DET E. JONES THAT YOU WANTED TO TELL ME SOME THINGS. NOW, I REPEATEDLY TOLD YOU THIS AND I WANT TO MAKE SURE THAT YOU UNDERSTAND THIS. YOU HAVE A RIGHT TO A LAWYER. I DON'T WANT TO INTERFERE WITH THAT. I DON'T WANT TO TELL YOU YOU CAN'T GET ONE. I'M TELLING YOU THAT YOU CAN HAVE ONE. BUT THAT I'M NOT GONNA HIRE HIM FOR YOU. AND WHAT I'M GONNA DO IS TAKE YOU BACK. YOU'RE GONNA, AND I TOLD YOU THAT NO MATTER WHAT YOU TELL ME TODAY, NO MATTER WHAT IT IS, YOU'RE GETTING CHARGED TODAY. WITH THOSE TWO CHARGES THAT I TOLD YOU.

EMILIA RARAS UM HM.

. . .

DET E. JONES . . . YOU COULD SIT HERE AND TALK TO ME IF YOU WANT. OR I'LL TAKE, I'LL DO WHAT WE TOLD YOU BEFORE. I'LL TAKE YOU BACK. WHERE, WHERE WE JUST WERE.

. . .

EMILIA RARAS UM HM.

DET E. JONES PUT YOU IN A CELL. THEY'LL FINGERPRINT YOU IN A LITTLE BIT. PHOTO-GRAPH YOU. WE'LL LET YOU CALL YOUR FAMILY OR WHOEVER IT IS THAT YOU CHOOSE TO CALL.

EMILIA RARAS UM HM.

DET E. JONES BUT THAT, YOU KNOW, IT'S YOUR CHOICE. YOU'RE THE ONE TELLING ME YOU WANT TO TALK TO ME. YOU CAN CHOOSE TO TELL ME A LITTLE BIT.

EMILIA RARAS I'LL TELL YOU EVERYTHING.

DET E. JONES YOU COULD, WELL, OR YOU COULD CHOOSE TO TELL ME IT ALL. I'M LEAVING THAT UP TO YOU. BUT BECAUSE YOU ASKED TO TALK TO ME AGAIN, I'M GONNA READ YOU THESE RIGHTS AGAIN. IF YOU WANT TO TALK TO ME NOW, THEN WE'LL GO AHEAD THROUGH THIS AND YOU CAN SAY YOU WANT TO TALK TO ME. YOU CAN PICK AND CHOOSE WHATEVER QUESTIONS YOU WANT TO ANSWER. YOU DON'T HAVE TO ANSWER ALL OF THEM. YOU CAN TELL ME THE SAME THING YOU'VE TOLD ME BEFORE. AND I'LL TAKE YOU BACK. JUST LIKE WE JUST DID. AND YOU CAN SIT DOWN BACK THERE AND ONCE THEY FINISH ALL THE PROCESSING, UM, YOU'LL GO BEFORE THE COMMISSIONER. BUT I'M LEAV-ING THIS CHOICE TO YOU. I WANT TO MAKE IT PERFECTLY CLEAR THAT I DON'T WANT TO IN-TERFERE WITH YOUR RIGHTS. IF YOU WANT TO TALK TO ME THAT'S GREAT. BECAUSE OBVIOUS-LY I WANT TO KNOW EVERYTHING THAT HAP-

PENED. BUT, UM, THAT'S YOUR CHOICE. OKAY?
YOU UNDERSTAND THAT? YES OR NO? YOU UN-
DERSTAND THAT? IT'S YOUR CHOICE.

EMILIA RARAS I UNDERSTAND....

The transcript of the interview further reflects that Detective
Jones gave appellant a copy of the statement of charges.
Appellant expressed her belief that the charges of conspiracy
and solicitation to commit murder were too "strong," and
indicated a desire to clarify her role in the matter.

Detective Jones reiterated to appellant that he would not
allow her to call her family yet because the investigation was
still underway. He volunteered that appellant's grandson was
with an officer at the "advocacy center," which is "a house
with kids toys and everything." Detective Jones explained to
appellant that the officer at the advocacy center would call
appellant's son, Lorenzo, as soon as Lorenzo got home from
work "to come pick up the child."

After ascertaining that appellant did not yet need her
diabetes medication, Detective Jones again advised appellant
of her rights. Detective Jones again stated that he would not
contact a lawyer for appellant and that she would have to do
so herself. In response to appellant's inquiry, the detective
explained that she would be given information on how to
contact the Office of the Public Defender when she went
before the Commissioner.

At 4:45 PM, appellant signed another advice of rights form,
this time waiving her rights to counsel and to remain silent.
Appellant indicated that she would make some clarifications
and would answer some questions, but might decline to answer
other questions until after she had consulted an attorney.

Appellant proceeded to describe to the detectives her rela-
tionship with the victim. She described several occasions on
which the victim had treated her with disrespect, and stated
that during one argument the victim actually spat in her face.
Appellant admitted that she discussed the spitting incident
with several co-workers at the nursing home where she was
employed as a nurse. She asked them what they would do if

they were her. One of those co-workers was Ardale Tickles. The transcript of the interview reflects that, at that point, the following transpired:

EMILIA RARAS ... AND I'LL NOT SAY ANYTHING MORE ON THAT. BECAUSE IT'S A LONG AND TEDIOUS PROCESS OF TEACHING.

DET E. JONES THAT YOU NEED TO DO?

EMILIA RARAS YES

DET E. JONES OKAY

EMILIA RARAS THIS IS THE THING. VERY WELL. THAT'S THE OPTION I WANT TO ASK MY LAWYER.

DET E. JONES OKAY. SO YOU WANT TO STOP NOW.

EMILIA RARAS I WANT TO STOP FROM THAT POINT. BECAUSE I MIGHT BE SAYING SOMETHING; YOU KNOW MY LANGUAGE IS DIFFERENT.

DET E. JONES OKAY.

EMILIA RARAS MY ENGLISH, MY ENGLISH IS DIFFERENT. THAT'S WHY I'M TRYING TO YOU TO CLARIFY.

DET E. JONES OKAY. ALL RIGHT. UM, DID, UM, IS THERE ANYTHING ELSE THAT YOU WANT TO TELL ME?

EMILIA RARAS. NOTHING MORE I WANT TO TELL YOU. THAT THAT IS NOT COMPLETELY RIGHT.[8]

DET E. JONES UM HM. WHAT DO YOU MEAN?

EMILIA RARAS THE ONE IN THE PAPER.

DET E. JONES THE CONSPIRACY PART?

EMILIA RARAS YES.

---

8. At the hearing on the motion to suppress, the prosecutor argued that the punctuation of this statement was inaccurate. The prosecutor argued that the transcription should read: "Nothing more. I want to tell you that that is not completely right."

DET E. JONES DO YOU KNOW WHAT CONSPIRA-
CY MEANS?

EMILIA RARAS WHAT?

Detective Jones explained that, under the circumstances, con-
spiracy "MEANS THAT YOU AND SOMEONE ELSE DIS-
CUSSED HOW OR WHAT IT IS THAT YOU WANTED TO
DO TO HAVE SOMEONE KILLED." Appellant stated: "I
DON'T KNOW, I DON'T KNOW HOW TO PLAN A MUR-
DER BECAUSE I AM NOT USED TO THAT." The detec-
tive responded: "BUT BEFORE WE GO, YOU SAID YOU
DIDN'T WANT TO TALK ABOUT THAT PART ANYWAY,
SO I DON'T WANT TO GO INTO THAT."

Detective Jones changed the subject. He reminded appel-
lant that she did not have to answer his questions, then asked
her if Lorenzo was involved. Appellant responded in the
negative. The detective also asked appellant where she got
the money that she paid to Tickles, and appellant responded
that it was her own money. Detective Peters then questioned
appellant as follows:

DET D. PETERS YOU DON'T HAVE TO ANSWER
THIS IF YOU DON'T WANT TO. BUT DID YOU KNOW
HOW HE WAS GOING TO KILL HER?

EMILIA RARAS NO. NO.

DET D. PETERS SO YOU KNOW THAT HE WAS
GONNA DO IT BUT YOU DIDN'T KNOW EXACTLY?

EMILIA RARAS ˙ IN FACT, I THOUGHT HE'S NOT
GOING TO KILL HER. KILL HER. BECAUSE HE
TOLD ME HE IS JUST GOING TO STONE THE
HOUSE. YOU KNOW. AS A REVENGE. FOR ME.

Shortly thereafter, appellant asked and was permitted to
use the restroom. Afterward, she was offered food but de-
clined it. Detective Jones assured appellant that someone
would ask Lorenzo to bring her her diabetes medication so
that she would have it when she needed it.

Questioning then continued, with Detective Jones reminding
appellant: "IF YOU DON'T WANT TO TALK TO ME

ABOUT A CERTAIN THING JUST TELL ME NO." In response to the detectives questions, appellant admitted, *inter alia*, that she described the victim to Tickles and gave Tickles the victim's address. She acknowledged that she made two payments: one of $300 or $400 and another of $2,000. The interview concluded at about 6:50 PM, and appellant was then permitted to telephone her son.

The trial court rejected appellant's motion to suppress her statement. In a 25–page "Memorandum and Order," the court determined that the police had properly complied with *Miranda.* It acknowledged:

There are certainly legitimate questions raised by the defense about the invoking of the grandchild's situation and the use of the gruesome crime scene photo of Sara Raras. These were obviously designed to have an effect on Mrs. Raras. . . .

The court pointed out that these incidents occurred before or during the first interview. Appellant subsequently reinitiated discussion with the police and was re-advised of her rights, and the court was satisfied that the statement made during the second interview was "free of . . . taint." *Inter alia*, the court determined that, in making her statement, appellant was not motivated by "concern about her grandson's safety or welfare, or by shock or remorse engendered by the photograph." Nor did the police mislead appellant or coerce her statement by failing to provide immediate access to an attorney.

The court further rejected appellant's suggestion that her statement should be suppressed because it was the fruit of the interrogation of Tickles which, as the State concedes, was conducted in violation of *Miranda.* The court opined that "the Defendant is asking this Court to plow new ground and transplant the 'poisonous tree' doctrine from the Fourth to the Fifth Amendment. . . ." It determined that there is "no basis in current law or in constitutional necessity to do so."

## DISCUSSION

### I

### Motion to Suppress

As the Court of Appeals recently summarized, an appellate court's

> review of the propriety of the trial court's denial of a motion to suppress evidence is limited to the record developed at the motions hearing.... [W]e consider only those relevant facts produced at the suppression hearing that are most favorable to the State as the prevailing party on the motion.... Although we make our own independent constitutional appraisal of whether a constitutional right has been violated, we will not disturb the trial court's factual findings unless those findings are clearly erroneous....

*Wengert v. State,* 364 Md. 76, 84, 771 A.2d 389 (2001). *See also Marr v. State,* 134 Md.App. 152, 163, 759 A.2d 327 (2000), *cert. denied,* 362 Md. 623, 766 A.2d 147 (2001).

### (i)

### —*Violation of Miranda as to Appellant*—

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be

used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.* The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

(Emphasis added; footnote omitted.) In *Dickerson v. United States,* 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court clarified that the *Miranda* rights are rooted in the United States Constitution; in particular, they are based on the Fifth Amendment right against compelled self-incrimination and the Due Process Clause of the Fourteenth Amendment. *See also* Md. Declaration of Rights arts. 22 and 24. If formal charges have been filed, "[t]he Sixth Amendment right to counsel[, which] attaches only at the initiation of adversary criminal proceedings" is also implicated. *Michigan v. Tucker,* 417 U.S. 433, 456, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). *See also* Md. Declaration of Rights art. 21. *See generally Webster v. State,* 299 Md. 581, 591–98, 474 A.2d 1305 (1984).

Appellant does not dispute that she was properly advised of her rights to counsel and to remain silent pursuant to *Miranda.* She suggests that, because she invoked both rights during the first interview, any statement she made thereafter was automatically inadmissible. Appellant herself admitted at the suppression hearing, however, that she asked Detective Jones after the first interview if she could speak with him in order to clarify certain matters. The uncontroverted evidence establishes, moreover, that at the start of the second interview appellant signed an advice of rights form

waiving her *Miranda* rights. It is beyond dispute that police may reinitiate discussion with a suspect who has invoked his or her right to remain silent if a significant period of time has elapsed and if the police have re-advised the suspect of his or her rights. *See Michigan v. Mosley,* 423 U.S. 96, 106–07, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)(plurality opinion); *Manno v. State,* 96 Md.App. 22, 42, 623 A.2d 677 (1993); *Latimer v. State,* 49 Md.App. 586, 589, 433 A.2d 1234 (1981). In addition, police may question a suspect who has invoked his or her right to counsel if it was the suspect who reinitiated discussion of the offense. *See Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Johnson v. State,* 348 Md. 337, 349–50, 703 A.2d 1267 (1998).

■ Appellant further contends that her statement should be suppressed because of *Miranda* violations committed during the second interview. As we indicated in our recitation of the relevant facts, appellant stated several times during the second interview that she wanted to talk with an attorney before discussing certain matters. She now argues that each such statement was an invocation of her rights to counsel and to remain silent, and that the interview therefore should have been terminated.

■ In making this argument, appellant ignores that the testimony at the suppression hearing and the transcript of the second interview establishes that appellant insisted on speaking with Detective Jones before consulting with an attorney. Detective Jones repeatedly told appellant that he could not talk with her because she had invoked her right to counsel. When the detective finally acquiesced, he made clear to appellant that she could pick and choose which questions she wanted to answer. Appellant made clear that she wanted to do just that. Appellant directs us to no authority that would suggest that, when a suspect expresses a desire to remain silent about certain matters having to do with the offenses until consulting an attorney, the police may not talk to her about *any* matter having to do with the offenses. To the

contrary, "[a] defendant may express an unwillingness to discuss certain subjects without indicating a desire to terminate an interrogation already in progress." *Vermont v. Bacon,* 163 Vt. 279, 658 A.2d 54, 66 (1995) (suspect's hesitation during interrogation to name accomplice was not invocation of right to remain silent). *See also Massachusetts v. Roberts,* 407 Mass. 731, 555 N.E.2d 588, 590 (1990) (suspect's refusal to answer some but not all questions was not invocation of right to remain silent); *California v. Silva,* 45 Cal.3d 604, 247 Cal.Rptr. 573, 754 P.2d 1070, 1083 (1988) (suspect's assertion that he did not "want to talk about" particular matter was not invocation of right to counsel as to all matters); *Michigan v. Spencer,* 154 Mich.App. 6, 397 N.W.2d 525, 528 (1986) (suspect's assertion that he wanted to limit his answers was not invocation of his right remain silent).

 Nothing in the transcript suggests that appellant unequivocally and unambiguously requested counsel during the second interview, moreover. In *Davis,* 512 U.S. at 459, 114 S.Ct. 2350, the Supreme Court explained that

[i]nvocation of the *Miranda* right to counsel "requires at a minimum, some statement that can reasonably be construed to be an expression of desire for the assistance of an attorney." ... But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

(Citation omitted; emphasis in original.) The *Davis* Court went on to comment:

Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.... Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding

counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

*Id.* at 461–62, 114 S.Ct. 2350. The Court summarized:

To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

*Id.* at 462, 114 S.Ct. 2350 (emphasis in original).

As the trial court insightfully summarized in its "Memorandum and Order," appellant had

indicated that there may be areas or subjects that she would talk about, and ones that she preferred not to or wished to talk to counsel about. The police officers here, and particularly Detective Jones, had had numerous discussions with her and had seen her change her mind, most notably in insisting on seeking to "clarify something" after just previously terminating the interview. In such a circumstance and context, the statements by Ms. Raras do not necessarily *communicate to a reasonable police officer with the back*ground with Ms. Raras that these officers had, that she was taking a firm position free of any ambiguities or equivocations either as to remaining totally silent or being desirous of counsel before continuing any discussion.

Even from a textual analysis, the ambiguities and potential equivocations are clear. Ms. Raras states: "And I'll not say anything more on that. Because it's a long and tedious process of teaching." What is the "that" she is referring to? Discussions with Tickles or something broader or narrower? Is she stopping because she does not want to incriminate

herself or simply because the process is a "long and tedious process of teaching"? And then when she states shortly thereafter: "This is the thing. Very well. That's the option I want to ask my lawyer." Again, what is the "thing" referenced? What "option" is she referring to? Is it only one area that she wants to discuss with her lawyer?

As Ms. Raras proceeds, she says, "I want to stop from that point. Because I might be saying something; you know my language is different." What is the "point" she is talking about? Where does it begin and end? Are there areas still open for discussion? Is her only problem that she lacks confidence in her spoken language skills? Support for this is in her statement that follows where she says, "My English is different. That's why I'm trying for you to clarify."

Significantly, as the trial court added: "[T]he police officers did not attempt to hone in on the areas [appellant] wanted to avoid, either to remain silent about or to consult with counsel about."

### (ii)

### —*Voluntariness of Appellant's Statement*—

Because our independent Constitutional appraisal of the record of the suppression hearing satisfies us that the police committed no *Miranda* violation against appellant such that suppression of the statement was required, we turn to appellant's contention that police misconduct rendered the statement involuntary. It is well-established that, to be admissible, a defendant's statement must be voluntary under Maryland nonconstitutional law and under the due process clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights. *See Ball v. State,* 347 Md. 156, 173–74, 699 A.2d 1170 (1997); *Burch v. State,* 346 Md. 253, 265, 696 A.2d 443 (1997); *Hof v. State,* 337 Md. 581, 597–98, 655 A.2d 370 (1995); *Hoey v. State,* 311 Md. 473, 480, 536 A.2d 622 (1988). As this Court has explained, "[t]he definitions of voluntariness enunciated by

both the Supreme Court and the Maryland courts are indistinguishable from one another." *Williams v. State*, 127 Md.App. 208, 222, 732 A.2d 376 (citation omitted), *cert. denied*, 356 Md. 179, 738 A.2d 855 (1999). The Court of Appeals has elucidated:

> Under State common law, a confession or other significantly incriminating remark may not be used as evidence against a defendant unless, in the metaphoric words of *Hillard v. State*, 286 Md. 145, 150, 406 A.2d 415, 418 (1979), it is "shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." In plain English, that means that, "under the totality of all of the attendant circumstances, the statement was given freely and voluntarily.... The "totality of the circumstances" test also governs the analysis of voluntariness under the State and Federal Constitutional provisions....

*Burch*, 346 Md. at 266, 696 A.2d 443 (citations omitted).

In analyzing the totality of the circumstances, courts look to a number of factors. *See Hof*, 337 Md. at 596, 655 A.2d 370. These include, but are not limited to, (1) where the interrogation was conducted, (2) the length of the interrogation, (3) who was present during the interrogation, (4) how the interrogation was conducted, (5) the content of the interrogation, (6) whether the defendant was given *Miranda* warnings, (7) the mental and physical condition of the defendant, (8) the age, background, experience, education, character, and intelligence of the defendant, (9) when the defendant was taken before a court commissioner, (10) whether the defendant was physically mistreated or intimidated, and (11) whether the defendant was psychologically pressured. *See id.* at 596–97, 655 A.2d 370. The trial court carefully considered each one of these factors before concluding that appellant's statement was voluntary.

Appellant now contends that, for several reasons, the court's determination was erroneous. Appellant argues that Detective Jones improperly preyed upon her concern for her grand-

son in order to induce a statement. In particular, she contends that he: told her in the car on the way to the police station to focus on her grandson's future; warned her at the station that her grandson would not be returned to Lorenzo if Lorenzo was involved in the murder; and failed to apprize her as to where her grandson had been taken and who was caring for him. Appellant further asserts that the police improperly overbore her will by expressing their confidence in the case against her and showing her a photograph of Tickles and a photograph of the victim's body at the crime scene. Appellant adds that the police engaged in several other improper acts, such as: failing to provide her with immediate access to an attorney or to make clear when she would be permitted to contact an attorney, and deliberately misconstruing her invocation of her right to counsel to be a request that the police hire an attorney for her; refusing to permit her to contact her family; and refusing to give her a pencil and paper upon her request when she was first taken to the processing area.

As we have indicated, the trial court acknowledged that appellant raised "legitimate questions" about Detective Jones' references to appellant's grandson and Detective Case's display of the crime scene photo. The court found, however, that these actions by the officers did not influence appellant. The Court of Appeals has explained that

> "[o]ne common thread that runs through our cases is that the promise must have *caused* the suspect to confess. If a suspect did not rely on an interrogator's comments, obviously the statement is admissible regardless of whether the interrogator had articulated an improper inducement." (Emphasis added.) Thus, it is the trial judge's responsibility to determine not only if an inducement was made, but to ascertain further whether or not the defendant was influenced by the inducement.

*Johnson,* 348 Md. at 350, 703 A.2d 1267 (affirming trial court's determination that improper inducement offered to suspect shortly after his arrest was sufficiently attenuated from state-

ment made two days later such that statement was admissible).

■ The trial court found that, contrary to appellant's suggestion, the police never implied that her grandson was in physical danger. Rather, they expressly reassured appellant that he was being cared for. The court did not find appellant's testimony that her statement was motivated by concern for her grandson to be credible. It stated:

A full reading of the transcripts actually shows surprising little interest being shown by Ms. Raras in her grandson's immediate safety, and there is no indication that she was genuinely fearful or apprehensive for his well-being or safety. Her discussions with the detectives were wide open, and she was able to direct them to items she was interested in discussing. If her central concern during the second interview had been the present and future safety of her grandson, she would certainly have included that in her responses, comments, and questions. The fact that there is so little about that subject belies the assertion now made. The Court recognizes that, in her direct testimony before this Court, Ms. Raras testified that this was a motivating factor, but considering it in the context of the full transcripts of the interviews and the other testimony presented, the Court does not find her in-court testimony credible on that point.

■ The court also rejected appellant's contentions that her statement was induced by the display of the crime scene photo. It observed that appellant herself testified that, while the photograph of the victim "scared" her, it did not cause her to make a statement. She testified that, in making the statement, she was motivated entirely by concern for her grandson. The court stated:

She does not appear to have been moved by any immediate concern about her grandson's safety or welfare, or by shock or remorse engendered by the photograph. Instead, she apparently wanted to explain how her status was not equiv-

alent to Tickles and her concerns about the content of the charges that had been filed.

■■■ The trial court summarily rejected appellant's other contentions regarding the involuntariness of her statement. This Court, like the trial court, is unpersuaded by appellant's assertion that her will was overborne by the police officers' expressions of confidence in the strength of their case and the display of the photograph of Tickles. By the mere fact of her arrest, appellant was well aware that the police had built a case against her. The police quite properly supplied appellant with a copy of the statement of charges, which referred to Tickles and indicated that appellant was suspected of solicitation and conspiracy to murder the victim. *See, e.g., State v. Conover,* 312 Md. 33, 42–45, 537 A.2d 1167 (1988) (no impropriety in providing suspect with copy of application for statement of charges, and application did not improperly induce suspect into making statement). As the trial court explained: "It is certainly true that any person who is under arrest and being questioned is under psychological pressure."

■■■ Like the trial court, we flatly reject appellant's contention that the police should have provided her with access to an attorney immediately upon her invocation of her right to counsel. In the words of the trial court, there is no

obligation on the [part of the] police to immediately provide access to a telephone to call counsel or to advise defendants at the police station of the specific procedures for obtaining the immediate services of a public defender. This is a process that takes place before the Commissioner, and there is no evidence here that Ms. Raras was being unreasonably detained from going to the Commissioner to be advised of her options.... In this case, there indeed may have been legitimate police reasons to temporarily keep Ms. Raras from communicating for the space of a few hours. The police believed they had under immediate investigation a conspiracy involving Ms. Raras and Mr. Tickles, who they also had just taken into their custody, but they were uncertain whether other associates of Tickles or Ms. Raras,

including her son, may have been involved. In such a situation, the Court does not find that there was an absolute obligation for telephone calls to be allowed to the outside, at least given the rather brief time delay presented in this case before the start of the second statement.

*Compare Williams,* 127 Md.App. at 230, 732 A.2d 376 (rejecting challenge to admissibility of statement made by murder suspect about two hours after suspect had requested counsel where suspect was processed and placed in interview room but counsel was not provided, and holding, where there was no suggestion that sensitive police investigation was underway at time, that "absent a request to use the telephone to contact either an attorney or someone who would contact an attorney for appellant, the police had no affirmative obligation to provide an attorney within the time appellant was sitting in the interview room, simply because appellant said he wanted to speak to an attorney before he made a written statement").

■ The record belies appellant's contention that the officers failed to make clear when she would be permitted to contact an attorney and deliberately misconstrued her invocation of her right to counsel to be a request that the police hire counsel for her. As we recounted in our recitation of facts, Detective Jones made clear to appellant that she would be permitted to contact counsel after she was processed. There is no suggestion that Detective Jones deliberately misconstrued appellant's words and attempted to confuse her when he informed her that he would not hire counsel for her. The detective merely explained that he would not contact counsel on her behalf, and that she would be given a complete explanation as to how to contact counsel when she went before the Commissioner.

■ Appellant's contention that the police overbore her will by refusing to permit her to contact her family is equally unavailing. As the trial court explained, at that time the police were in the process of rounding up and interviewing suspects and witnesses in the murder investigation. They were unsure as to whether appellant's son, Lorenzo, or any

other family members were involved. Under the circumstances, we agree with the trial court that the police were justified in delaying appellant's contact with her family by the same "legitimate police reasons" that justified them in briefly delaying her contact with an attorney. In any event, the record reflects that appellant arrived at the police station at 3:00 to 3:15 PM on August 24, 1999. She signed an waiver form and began giving her statement less than two hours later, at 4:45 PM. She was not continuously questioned during the intervening time, nor was she physically mistreated. She was not denied access to food, water, or restroom facilities. She was not under the influence of drugs and was not in need of any medications. Under the circumstances, the delay in permitting appellant to use the telephone cannot be viewed as coercive.

Appellant's complaint that the officers refused to give her a pencil and paper so that she could right down her thoughts is specious. Detective Jones testified that, when he suggested to appellant that she go to a holding cell for a while to think about whether she really wanted to talk with him, appellant "wanted to know if she could take a—a pencil and a piece of paper into the cell to write down whatever it was that she was thinking about." It thus appears from the testimony that appellant wanted to make a written statement. She now appears to be arguing that, by refusing to provide her with the means to make a written statement, the police improperly induced her to make an oral statement. Even if we perceived this to be a tenable argument—and we do not—it was the booking officer and not Detective Jones who denied appellant's request and who indicated that suspects are not permitted to take pencils and paper into their cells. We detect no impropriety in such a policy.

In sum, upon reviewing the evidence presented at the suppression hearing in the light most favorable to the State, and conducting our own independent constitutional appraisal of the law as applied to the facts, we are satisfied that the trial court properly determined that appellant's statement was

voluntary. By this, we by no means suggest that we view all of the police conduct in question as exemplary. We observe that "[j]ust as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic." *Michigan v. Tucker*, 417 U.S. at 446, 94 S.Ct. 2357. " '[T]he ... inquiry is not whether the conduct of [the authorities] was shocking, but whether [the accused's] confession was free and voluntary...." *Hof*, 337 Md. at 595, 655 A.2d 370.

(iii)

*—Violation of Miranda as to Tickles—*

 The State concedes that Ardale Tickles invoked his rights to counsel and to remain silent, but that police continued to question him. Tickles then implicated appellant, and appellant was arrested shortly thereafter. Appellant argues that her own statement was the fruit of the improper interrogation of Tickles and therefore should have been suppressed. The short answer to this argument is that appellant lacks standing to raise it.

In *Whitfield v. State*, 42 Md.App. 107, 400 A.2d 772 (1979), *rev'd on other grounds*, 287 Md. 124, 411 A.2d 415 (1980), an inmate and a guard at the Baltimore City Jail were prosecuted in connection with an escape attempt. The inmate had made statements to correctional officers during a custodial interrogation, and both the inmate and the guard moved to have the statements suppressed on the ground that the inmate had not been advised of his rights pursuant to *Miranda*. The trial court denied this motion and, on appeal, this Court determined:

> Of course, [the guard who did not make the statement] has no standing to raise the *Miranda* issue. The privilege against self-incrimination is highly personal and may not be

vicariously utilized.... [The guard] may not seek refuge under [the inmate's] constitutional umbrella.

*Id.* at 124, 400 A.2d 772 (citation omitted). *Cf. Butz v. State,* 221 Md. 68, 73, 156 A.2d 423 (1959) (trial court properly overruled objection of defendant to testimony of witness on ground that testimony was being elicited in violation of witness's privilege against self-incrimination); *Rowe v. State,* 62 Md.App. 486, 499, 490 A.2d 278 (1985) (same); *Ball v. State,* 57 Md.App. 338, 360, 470 A.2d 361 (1984) (rejecting appellant's argument that co-defendant's statement was involuntary and should not have been admitted into evidence, and explaining that voluntariness of co-defendant's statement was "a personal constitutional concern of [co-defendant] and the appellant ... has no standing to raise the issue"), *aff'd in part and rev'd in part on other grounds,* 307 Md. 552, 515 A.2d 1157 (1986).

Because a suspect lacks standing to challenge, on *Miranda* grounds, the statement of second suspect, it follows that the first suspect would also lack standing to challenge evidence derived from such a statement. "[E]ven if the defendant was himself subjected to an arrest or search based upon a confession obtained from another in violation of *Miranda,* he would lack standing to claim that what was obtained by the arrest or search should be suppressed as fruits of the *Miranda* violation." 3 Wayne R. LaFave, Jerold H. Israel, & Nancy J. King, *Criminal Procedure* § 9.1(a) at 318 (2d ed.1999). *Cf. McMahon v. Texas,* 582 S.W.2d 786, 790 (Tex. Crim.App.1978) (rejecting appellant's argument that if co-defendant's confession was involuntary his own confession was fruit of poisonous tree, and explaining that appellant had no standing to challenge voluntariness of co-defendant's confession).

Even assuming, *arguendo,* that appellant had standing, we would affirm the trial court's judgment on the ground set forth by the trial court. In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court refused to apply the fruit of the poisonous tree doctrine—which originated as a Fourth Amendment doctrine—to

suppress a second statement made by a suspect who had properly been advised under *Miranda* before making that statement but who had made an earlier statement prior to any advice of rights. *See Dickerson,* 530 U.S. at 441, 120 S.Ct. 2326 (explaining that the *Oregon v. Elstad* "simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment"). Relying on *Oregon v. Elstad,* this Court has explained that

> a failure to provide the *Miranda* warning does not necessarily preclude the introduction of derivative evidence. Rather, that evidence is inadmissible only if the confession from which it was derived was coerced.... [O]btaining a confession in violation of the *Miranda* rule does not automatically destroy the admissibility of evidence discovered by using the unwarned confession.

*In Re Owen F.,* 70 Md.App. 678, 687, 523 A.2d 627 (1987) (juvenile's gesture pointing out stolen goods was inadmissible due to *Miranda* violations, but stolen goods recovered as result of gesture were admissible). *See also Fried v. State,* 42 Md.App. 643, 646, 402 A.2d 101 (1979) (holding that failure to provide proper *Miranda* warning prior to first confession does not *ipso facto* taint subsequent confession before which proper warning was provided, and explaining that "the doctrine of taint, *i.e.,* the fruit of the poisonous tree, does not follow from a 'mere *Miranda*' violation ... but applies only to confessions *involuntarily* obtained as by improper inducements or coercion" (emphasis in original)).

Appellant does not so much as allege that Tickles' statement was involuntary. We therefore decline to extend the fruit of the poisonous tree doctrine to the instant case.

## II

### Instruction on First Degree Murder

At the close of all evidence at trial, the court instructed the jury on first degree murder as follows:

... The State is obviously proceeding on the theory that the Defendant, Emilia Raras, hired Ardale Tickles to murder Sara Raras. I will first describe a first degree murder generally, and then put it in terms applicable to this case.

First degree murder is the intentional killing of another person with wilfulness, deliberation, and premeditation. In order to convict the Defendant of first degree murder, the State must prove: One, that the conduct of the Defendant caused the death of Sara Raras; and that the killing was wilful, deliberate, and premeditated.

Wilful means that the Defendant actually intended to kill the victim. Deliberate means that the Defendant was conscious of the intent to kill. Premeditated means that the Defendant thought about the killing and that there was enough time before the killing, though it may only have been brief, for the Defendant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.

Under the facts of this case, you must determine whether you are unanimously persuaded, beyond a reasonable doubt, of two things: First, that the Defendant engaged or employed another person to murder the victim and second, that the murder was committed as a result of that agreement or contract for remuneration. Remuneration means payment or reward for service.

Apparently as a trial tactic, defense counsel never asked the court to instruct the jury on any lesser included offense of first degree murder. No exception to the first degree murder instruction was taken. Each of the jurors was given a written copy of all of the instructions.

Toward the end of its second day of deliberations, the jury sent a note to the court asking two questions. The first asked: "If Person 'A' contracts with Person 'B' for revenge, with no expectation of death, and death occurs as a result, is Person 'A' guilty of first degree murder?" The second question asked: "If a person who contracts with another person for

revenge knew that death was a possible outcome of the revenge, does that constitute first degree murder, if murder is the outcome?"

The court suggested answering the first question with "a flat 'No,' " and both the prosecutor and defense counsel agreed. The prosecutor asked the court to answer the second question by directing the jury to its earlier instruction on first degree murder and to another instruction it had given on proof of intent. Defense counsel, however, opposed reiteration of the proof of intent instruction. He stated:

> ... I would first ask that [the second question] be answered "No." Alternatively, I would ask that you read to the jury in open court the [first degree murder] instruction beginning with "Wilful" and "killing," and then explain that if you were going to use the Proof of Intent instruction, that under the facts of this case, Mrs. Emilia Raras cannot be guilty of first degree murder unless she actually intended the death of Sarah at the time of any contract for revenge.

Defense counsel explained: "I believe the [second] question ... refers to a second degree depraved heart or involuntary manslaughter and that's my support for why I believe the answer would be 'No.' "

■■■ The court answered the questions in writing. As to the first question, the court stated simply: "No." As to the second question, the court wrote: "On this question, I refer you to the instructions, and specifically, the instructions on Homicide—First Degree Premeditated Murder, Page Nineteen and Twenty." Appellant now contends that the trial court erred by failing either to answer the second question with a simple "no" or to inform the jury that "Raras could not be guilty of first degree murder unless she actually intended the death of Sara at the time of any contract for revenge." The fatal flaw in this argument is that it is not properly before this Court. *See generally* Md. Rule 4–325(e) ("No party may assign as error the giving or failure to give an instruction unless the party objects on the record ...").

Defense counsel clearly suggested, as an acceptable alternative to answering "no" to the second question, that the court repeat the above-quoted portion of the instruction on first degree murder. That is precisely what the court did. Although counsel suggested that the court orally re-instruct the jury, we perceive no significant difference between oral re-instruction and the court's direction to the jury to reread the pertinent written instruction. Defense counsel made no objection when the court suggested answering the question in writing. Contrary to appellant's assertions, moreover, defense counsel asked that the court instruct the jury that appellant could not be guilty of first degree murder unless she intended the victim's death at the time of any contract *only if* the court directed the jury's attention to the proof of intent instruction. The court did not direct the jury's attention to that instruction.

Appellant does not ask this court to take cognizance of plain error, and we see no reason to do so. *See generally* Md. Rule 4–325(e) ("... An appellate court, on its own initiative or on the suggestion of a party, may ... take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object"); *Conyers v. State,* 354 Md. 132, 171, 729 A.2d 910 (explaining that "the plain error doctrine is used sparingly" and is invoked only in "situations that are 'compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial' " (citation omitted)), *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999). "The decision to supplement its instructions and the extent of supplementation are matters left to the sound discretion of the trial judge, ... whose decisions will not be disturbed on appeal in the absence of a clear abuse of discretion." *Howard v. State,* 66 Md.App. 273, 284, 503 A.2d 739 (1986) (citation omitted). The instruction on first degree murder given by the court, and to which the court redirected the jury in response to the second question, was virtually identical to that set forth at Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instruction* 4:17 at 217 (1995). The only language added by the court explained when

a contract killing may constitute first degree murder. The instruction made abundantly clear that, in order to find appellant guilty of first degree murder, the jury had to conclude that appellant hired Tickles to murder the victim, and that appellant intended for Tickles to kill the victim, was conscious of that intent, and thought about the killing in advance. We are satisfied that the jury was not misled.

**JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.**