995 A.2d 985

**Lee Andrew COLEMAN–FULLER**

v.

**STATE of Maryland.**

**No. 1913, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

May 27, 2010.

578

Michael R. Braudes (Elizabeth L. Julian, Acting Public Defender, on the brief), Baltimore, MD, for appellant.

Diane E. Keller (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: DAVIS, JAMES R. EYLER and MATRICCIANI, JJ.

DAVIS, J.

On May 8, 2006, a Baltimore County grand jury indicted Lee Andrew Coleman–Fuller, appellant, for the first-degree murder of Travis Taylor. Md.Code (2002 Vol., 2008 Supp.), Crim. Law. § 2–201. On September 5 and 6, 2007, and again on November 6, 2007, the Circuit Court for Baltimore County heard appellant's motion to suppress two statements that he made to police, on April 12 and April 19, 2006, and the evidence derived from his first statement. The court granted the motion to suppress the April 12th statement, but denied the motion to suppress the April 19th statement and the evidence derived from appellant's April 12th statement. On April 14, 2008, the court heard appellant's motion *in limine* regarding the State's attempt to introduce cell phone records and cell phone tracking evidence through a detective instead of an expert witness. The court ruled that such evidence did not require expert testimony and denied the motion. Thereafter, on May 5 through May 15, 2008, a jury trial was held. On May 15, 2008, the jury convicted Lee Andrew Coleman–Fuller, appellant, of the first-degree murder of Travis Taylor. On

September 10, 2008, the court sentenced appellant to life imprisonment without the possibility of parole.

Appellant filed a timely appeal and raises six questions for our review, which we quote:

I. Did the trial court err in refusing to instruct the jury on the law relating to accomplice testimony?

II. Did the trial court err in denying appellant's motion to suppress the second of his two statements to [the] police?

III. Did the trial court err in denying appellant's motion to suppress the fruits of his first statement to [the] police?

IV. Did the trial court err in permitting a lay witness to present expert testimony concerning cell phone records and cell phone technology?

V. Did the trial court erroneously restrict defense cross-examination of Shamar Harris?

VI. Did the trial court err in permitting improper prosecutorial closing argument?

For the reasons that follow, we answer appellant's first and third questions in the negative, decline to address his sixth question, and answer his remaining questions in the affirmative. Accordingly, we vacate the judgment of conviction for first-degree murder and remand the case to the Circuit Court of Baltimore County for a new trial.

## PROCEDURAL AND FACTUAL BACKGROUND[1]

The charges against appellant stem from a murder that took place at 2878 Scarborough Circle in Woodlawn, Maryland on April 11, 2006. On the evening of April 11th, the victim, Travis Taylor, was stabbed to death at the home of April

---

1. This factual and procedural background is based on the trial testimony of witnesses; however, the testimony of certain witnesses has been redacted and summarized as it contained issues not relevant to the issues on appeal. Additionally, we have omitted testimony of certain witnesses that is not germane to the issues on appeal.

Goggans. At the time, both appellant and Taylor were staying with Goggans. After two interrogations, one on April 12, 2006 and another April 19, 2006, the police arrested appellant for the murder. As noted, appellant's trial before a jury transpired from May 5 to May 15, 2008.

Goggans testified that she and her daughter lived on Scarborough Circle during the Spring of 2006. She was a self-professed alcoholic who drank ". . . every night. All day every day on the weekends." She also admitted that she was fairly promiscuous. One night in February 2006, she met appellant, whom she knew as "Javier," and his friend, Kenneth "Bean" Hill. The first night that they met, she had sexual relations with both Hill and appellant. Shortly thereafter, Goggans continued to carry on a sexual relationship with Hill. A few weeks later, appellant began to stay at Goggans's house. He slept on her couch and used her car to earn money as a "hack," a slang term for an unlicensed cab driver. Goggans admitted that, during this time, she carried on a sexual relationship with appellant.

The events ultimately ending in Taylor's murder began during the first week of April 2006. Goggans met Taylor while he was attending a party at her house at the invitation of Hill. Goggans and Taylor talked most of the night and, in her words, "kind of hit it off." She and Taylor discussed her drinking problem and the number of people in her house. She related part of the conversation she had with Taylor in which he told her " 'you just got to stop, you got to stop drinking, you got to get these people out of your house . . . you got to stop letting people beat on you.' " She further recollected that, the next day, "it was obvious that we connected in that way" and that she and Taylor were starting a relationship.

She recounted that, when she met Taylor, appellant was continually spending nights sleeping on her couch and she would "wake up and he was there in the morning." On the morning after she met Taylor, she had intended to use her car, but appellant had rendered it unfit to drive and she did not have the money to fix it. Despite this, she said that

everything remained "fine up until about the second day [Taylor] was there."

On the morning of the second day that Taylor was at her house, Goggans noticed that appellant was putting more of his belongings in her closets, as if he were moving in. Out of patience with appellant and exacerbated by the fact that he had disabled her car, Goggans, along with Taylor, confronted appellant later that afternoon. Goggans told him that, while he was permitted to stay at her house occasionally, he could not live there. She stated that appellant was upset and said, " 'I've been staying here. Everything's been fine till Travis got here.' " When she responded that he could not live there, he stated " 'Man, you make me so mad, you make me want to kill you.' " Thereafter, appellant walked into the kitchen and Goggans "heard a silverware drawer being messed around in." [2] When appellant reentered the room, Taylor told him that he had to leave and, according to Goggans, Taylor and appellant "stared at each other but it wasn't an altercation."

Goggans and Taylor had a conversation later that night in which he agreed to help her "fix the situation," meaning that he would help her to evict the people in her house and he would help her to stop drinking. Taylor stayed with Goggans throughout that night as she suffered symptoms of alcohol withdrawal.

The next day, April 11th, Taylor, Hill, Goggans and her daughter were at her house and the day was "kind of slow." Taylor helped Goggans clean her house and told anyone who came to the house that they could not come inside. Eventually, Goggans asked Hill to call someone so that they could take her daughter to get some food. At approximately 10:45 p.m., one of Hill's friends arrived to take Hill, Goggans and her daughter to buy food.

As she was preparing to leave, Hill was on the phone with appellant. Goggans spoke to appellant and told him that he

---

2. Witnesses later testified that appellant emerged from the kitchen holding a knife.

needed to retrieve his belongings. She testified that appellant was upset when she said this:

> He told me, just told me, you know, there was nothing else to say. I told him, I say, ["]You need to come get your stuff.["] He's like, ["]Man, you know, this shit is making me mad.["] And I'm like, ["]Well, you need to come get your stuff.["] And he was like, ["]Are you saying that I have to get my stuff?["] I said, ["]There's nothing else to say, okay["].

She then proceeded to get her daughter ready to leave. She stated that the person that Hill had called to provide transportation arrived and she, Hill and her daughter exited the front door. Taylor declined to accompany them. Goggans recounted that she did not close the door all the way when she left because she knew appellant was coming to pick up his belongings.

While Goggans, Hill and her daughter were walking to the car that was waiting out front, she noticed that appellant was walking with two people toward her house. She testified that she knew one person as "Nick" and that the other person was someone she had met through appellant, but she could not recall his name. Appellant did not say anything as he passed, but Goggans recollected that appellant "stare[d] me down before he got into the house."

Goggans watched the three men go through the front door; they did not shut the door all the way. She witnessed appellant's "shirt go up as if he was going up the stairs." At this point, as she was walking toward the car, she heard the door shut. Then, she heard "feet like on a basketball court, like when they scuff, squeak a little bit" followed by Taylor "crying in pain." Shortly after she heard Taylor's cries, she saw Nick and the other individual run out of the house.

Goggans told Hill that she wanted to go see what was happening, but Hill insisted that Taylor was fine and that they needed to go to his house so that he could get changed and go to a local Wendy's. As they drove away, she witnessed appellant emerge from the house, stand in front of the door

and stare at her. She stated that she wanted to go back, but did not because Hill assured her that everything was fine.

Goggans and Hill then drove to his mother's home and remained there for approximately forty-five minutes. They later drove back to her house and, when she opened the door, she saw Taylor lying on the stairs. Believing that Taylor had just been knocked unconscious, she took her daughter to a neighbor and called 9–1–1.

She testified that she made a statement at the scene and later talked to detectives from the Baltimore County Police Department—statements that she admitted were inconsistent, but that were inconsistent, she explained, because she was in shock when she first saw the body. She also identified photographs of "Nick" and appellant. On the witness stand, Goggans identified appellant from a photograph taken from a Wendy's surveillance camera earlier in the evening on the date of the murder. Appellant, she recounted, was wearing a hat that was later found next to her sink in her home.

Shamar Harris was one of the individuals with appellant at the time of the murder. He testified that he knew appellant and Nicholas Jones, but "not that well." He had only met them a couple of times. On the night of the murder, he met appellant and Jones at Barnesley Place, near the scene of the crime, and the three of them went to a local Chinese carry-out restaurant and a Wendy's restaurant. While they were sitting at Wendy's, appellant received a cell phone call and, after the call, appellant's "whole attitude had changed ... He went from being calm to like upset." After the cell phone call, Harris, Jones and appellant "[w]ent to some female's house." There, appellant and Taylor, whom Harris had never met before, began arguing. A fight erupted, during which Harris saw appellant brandish a knife and stab Taylor. He stated, "[a]fter I saw the stabbing, I was in a state of shock, and I had left the house." He met Jones at the top of the block and they continued walking when appellant rejoined them. At that point, Harris recalled, appellant discarded a knife in the vicinity of Barnesley Place. Harris admitted that he had

recognized the knife because it was a knife that he had given appellant a few days before April 11, 2006. He gave the knife to appellant, he said, because, as he was "about to just throw the knife away," appellant asked him for it. He insisted that, when he gave the knife to appellant, he did not know what appellant was going to do with it. According to Harris, he did not know what was going to happen when they left Wendy's Restaurant to go to Goggans's house that night.

Nicholas Jones had also accompanied appellant and Harris on the morning in question. He testified that he had known appellant for several years and he knew Taylor for a month or two before his death, adding, "I didn't know him [Taylor] that well, but I never got into an argument or anything with him." Jones was familiar with appellant and Taylor's relationship, which he described as a "50/50" relationship, meaning that, "at first they just didn't say nothing to each other, then it escalated." According to Jones:

At first, I mean, he felt as though [Taylor] was stealing [Goggans] from him, and he started getting mad because of that. Then he started getting madder and madder. Then it escalated to the situation that happened.

Jones further testified that, on April 11th, the day of the murder, he met appellant and Harris and they went to "the Chinese spot and ordered some Chinese food, and then went to Wendy's." While they were eating at the Wendy's, someone called appellant's cell phone and he became upset. Thereafter, the group left the Wendy's Restaurant and, as they proceeded to Goggans's house, appellant told Jones that they were going to "tap" Taylor. Jones stated that, at first, he did not understand what appellant meant, but he had an idea that it meant appellant was going to "beat up," stab or shoot Taylor. When they arrived at the house, Hill and Goggans were there. According to Jones, first Goggans and appellant began to argue, then Goggans left and appellant and Taylor began to argue. Jones witnessed appellant brandish a knife and, before he ran out of the house, Jones saw appellant stab Taylor three or four times; neither he nor Harris was involved in the fight with Taylor. Harris and Jones ran to the

top of the block and, out of breath, waited there. After "about ten seconds," appellant joined them. The three began to run and, as they were running, appellant discarded a knife somewhere near Barnesley Place. Jones stated that the knife that appellant employed in committing the murder and discarded in the woods was that which Harris had given appellant a couple of days prior to the murder. Later, Jones took police officers to the scene to recover the knife.

Dwayne Meyers, a resident of the neighborhood surrounding Scarborough Circle, testified that he met appellant sometime between March and September 2005. Meyers stated that appellant told him, " I should have poke [sic] him up,' " referring to the initial confrontation appellant had had with Taylor at Goggans's house. Meyers understood this to mean that appellant wanted to stab Taylor. Meyers stated that appellant was angry, in part, because Taylor was going to "wife up" Goggans, meaning start a relationship, and this was going to leave appellant without a place to stay.

After the murder, Meyers spoke with police officers. In an effort to locate appellant, Meyers, in cooperation with Detective Childs of the Baltimore City Police Department, attempted to call both appellant and Goggans using the direct connect "chirp" function on his Nextel phone, which allowed him to directly connect to another phone, similar to a "walkie-talkie." Eventually, Meyers was able to reach appellant and they had a brief conversation, while Detective Childs listened via the speaker phone. Meyers sought to engage appellant in a discussion about the murder, to which appellant responded that he thought someone had been "banked, jumped, beat on, that's it." Meyers informed appellant that Taylor was the victim and appellant responded, " 'oh, for real[?]' " Meyers attempted to induce appellant to state where he was, but appellant avoided the question and told Meyers that he would need to talk to him later.

Meyers also assisted Detective Childs in locating Nicholas Jones, who had eluded the police after the murder; once Jones surfaced in the neighborhood, Meyers notified Detective

Childs. When Meyers and Jones walked to a local gas station, as the officers approached them, Jones slipped Meyers a knife. After the officers arrested Jones, Meyers gave the knife to the police.[3] Meyers stated that there was no blood on the blade at the time.

Kenneth Hill testified that he knew appellant for one or two years before Taylor's murder. During the weeks before the murder, both he and appellant had spent the night at Goggans's house. Hill had known Taylor for nearly as long as he had known appellant. During the first altercation between Taylor and appellant at Goggans's house, there was a pocket knife or a house knife involved in that fight, but that "everything just died on down after we stopped them." Hill also recalled seeing appellant, Jones and Harris approach Goggans's house as he, Goggans and her daughter were getting ready to leave. He saw appellant and two other individuals leave "in a hurry" as they drove off. After he, Goggans and her daughter had left the house to get food, he received a call from appellant in which appellant stated, " 'yo, me and your boy, we just got into it, I just now had to fuck you [sic] boy on up.' " Hill told appellant that he needed to "chill" and ended the conversation. When Hill returned to Goggans's apartment, he found Taylor on the stairs, saw blood, checked Taylor's pulse and then told Goggans to call 9–1–1. Hill admitted that he attempted to leave the scene, explaining that he left because he did not want to be involved. Apartment complex security guards stopped Hill and eventually spoke to the police.

Benjamin Angel, a resident of the neighborhood where the murder occurred, testified that he had met appellant two or three weeks before the murder and, on the night in question, he was out walking his dog when he ran into "Corey," appellant's and his mutual friend. While they were talking, Corey made a direct connect cell phone call to appellant, whose voice Angel recognized because he had spoken to appellant on the

3. Jones was arrested on an unrelated violation of probation.

phone previously. He testified that appellant told Corey not to go to Goggans's house because it was "a bloody mess."

Kelly Franklin, an inmate at the Baltimore County Detention Center who was incarcerated in the same unit as appellant after appellant's arrest, testified that appellant confided in him that he stabbed a man eleven to thirteen times to help a friend.[4]

Detective Gary Childs of the Baltimore County Police Department testified regarding his role in the investigation into Taylor's murder. In addition to relating the manner in which his investigation proceeded and the ultimate arrest of appellant as a suspect, Detective Childs testified extensively from the cell phone records of two cell phones recovered from appellant at the time of his arrest. Utilizing the records, Detective Childs (1) demonstrated that appellant was not truthful when he told police that he had not called or spoken to certain individuals, (2) corroborated the testimony of other witnesses regarding cell phone calls that they had with appellant, including the parties to those calls and the timing, and (3) over the objection of appellant, he used the records and cell phone tower sites to approximate appellant's location at the times just before, during and after the murder.

After the presentation of all of the evidence, each side made their closing statements. On May 15, 2008, after a few hours of deliberation, the jury convicted appellant of first-degree murder. The court ordered a pre-sentence investigation and, on September 10, 2008, sentenced appellant to life imprisonment without the possibility of parole. Appellant filed a timely Notice of Appeal on September 11, 2008.

Additional facts shall be provided *infra* as warranted by our discussion of the issues.

---

**4.** Franklin admitted that, as a result of his agreement to testify in this case and others, his first-degree murder charge was *nol prossed* and he was charged, instead, with second-degree murder.

**590**

## LEGAL ANALYSIS

### I

 Appellant's first contention is that the trial court erred in denying his request for a jury instruction on accomplice liability. At trial, appellant's counsel tried to develop the theory that appellant was not at the scene of the murder, but instead, was the victim of a conspiracy between many of the witnesses who sought to frame appellant for Taylor's murder. During his cross-examination of most of the witnesses—Jones and Harris in particular—appellant's counsel questioned those witnesses at length about involvement in the murder, at times suggesting that they committed the murder or hired individuals to commit the murder. Specifically, appellant's counsel cross-examined the witnesses in an attempt to prove that Shamar Harris and Nicholas Jones, the two eyewitnesses to the murder, were, in fact, the actual perpetrators of the crime.

After the presentation of all of the evidence, appellant's counsel requested that the court propound Maryland Criminal Pattern Jury Instruction 3:11B, the "Testimony of an Accomplice" instruction to the jury.[5] The trial court declined to give

---

**5.** Maryland Criminal Pattern Jury Instruction 3:11B provides, in pertinent part:

> You have heard testimony from [name of witness], who may have been an accomplice. An accomplice is one who knowingly and voluntarily cooperated with, aided, advised or encouraged another person in the commission of a crime.
>
> If you are not convinced that [name of witness] was an accomplice, you should treat that testimony as you would treat the testimony of any other witness. On the other hand, if you are convinced that [name of witness] was an accomplice, you must then decide whether that testimony was corroborated before you may consider it. The defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. However, only slight corroboration is required. This means there must be some evidence in addition to the testimony of [name of witness] tending to show either (1) that the defendant committed the crime charged or (2) that the defendant was with others who committed the crime, at the time and place the crime was committed.
>
> If you find that the testimony of [name of witness] has been corroborated, it should be considered with caution and given such weight as you believe it deserves. If you find that [name of witness] was an

the instruction and appellant's counsel objected after the court instructed the jury. During the ensuing bench conference, he asserted that he would like the instruction read, to which the trial court responded, "Yeah, I did not think the evidence generated that instruction.... In addition to the comments already made, the accomplice [sic] I don't think the evidence generated [that] either of the two eyewitnesses were accomplices to the murder." The court ruled, as a matter of law, that appellant did not meet his burden of production and did not generate a genuine jury issue that Jones or Harris could be considered accomplices.

Appellant asserts that, in so holding, the trial court erred because "the record viewed in a light most favorable to [appellant] overwhelmingly paints both Jones and Harris as accomplices." At the very least, appellant posits, the issue of whether they were accomplices should have been submitted to the jury. Without conceding that he was actually the perpetrator of the crime, appellant asserts that the jury could have found

> that both [Harris and Jones] accompanied the perpetrator to the scene of the murder; that they were with him during the murder; that they knew he was armed; that the perpetrator would never have brought witnesses to the scene of the murder unless he knew them to be his confederates; that Jones and Harris were with the perpetrator while the stabbing occurred; and they departed the scene in lockstep with him, watched him dispose of the knife, and made no effort to summon police or at least medical aid for Taylor, as a non-accomplice certainly would.

The State counters that, "[e]ven assuming arguendo that all [of appellant's] points were supported by at least some evidence, they were insufficient, without more, to generate an

---

accomplice, but that [his][her] testimony has not been corroborated, you must disregard it and may not consider it as evidence against the defendant. Remember, the defendant cannot be convicted solely on the uncorroborated testimony of an accomplice.
MPJI–Cr 3:11B

issue of accomplice testimony" because "[t]here was no evidence whatever [sic] that Jones or Harris actually participated in, aided or encouraged the murder, nor was there any evidence from which it could be inferred that they harbored any intent to kill or harm" the victim. Moreover, the State counters, to be considered an accomplice, a person must participate in the commission of the crime "with common criminal intent ... or must in some way advocate or encourage the commission of the crime." Here, there was no evidence that Harris and Jones possessed a common criminal intent with appellant at the time of the murder. We agree.

" 'The main purpose of a jury instruction is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict.' " *Cruz v. State*, 407 Md. 202, 209, 963 A.2d 1184 (2009) (quoting *Chambers v. State*, 337 Md. 44, 48, 650 A.2d 727 (1994)). Pursuant to Md. Rule 4–325(c), "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." (emphasis added). The Court of Appeals has interpreted Rule 4–325(c)

> as requiring the trial court to give a requested instruction when: (1) the requested instruction is a correct statement of the law; (2) *the requested instruction is applicable under the facts of the case;* and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given.

*Tucker v. State*, 407 Md. 368, 379–80, 965 A.2d 900 (2009) (citing *Dickey v. State*, 404 Md. 187, 197–98, 946 A.2d 444 (2008); *Thompson v. State*, 393 Md. 291, 302–03, 901 A.2d 208 (2006); *Patterson v. State*, 356 Md. 677, 683–84, 741 A.2d 1119 (1999))(emphasis added). Thus, a criminal defendant "is entitled to have the jury instructed on any theory of the defense that is fairly supported by the evidence". and "[w]hether a particular instruction must be given depends upon whether there is any evidence in the case that supports the instruction; if the requested instruction has not been generated by the

evidence, the trial court is not required to give it." *General v. State,* 367 Md. 475, 485–87, 789 A.2d 102 (2002).

 The determination of the sufficiency of the evidence to generate a jury instruction is a legal determination for the judge to make under the "some evidence" standard. *Abbott v. State,* 190 Md.App. 595, 989 A.2d 795 (2010). This standard was set forth by the Court of Appeals in *Dykes v. State,* 319 Md. 206, 571 A.2d 1251 (1990), where the Court explained:

> Some evidence is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

*Id.* at 216–17, 571 A.2d 1251. In evaluating whether competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused. *General,* 367 Md. at 487, 789 A.2d 102.

 To determine whether a witness could be considered an accomplice, the test commonly applied is to determine if the witness could have been indicted and punished for the offense, either as a principal or as an accessory. *In re Anthony W.,* 388 Md. 251, 274, 879 A.2d 717 (2005) (citing *Harriday v. State,* 228 Md. 593, 596, 182 A.2d 40 (1962)). When the evidence is capable of different determinations or different inferences, then there is an issue that must be submitted to the trier of fact with proper instruction. *Christopher v. State,* 9 Md.App. 277, 281, 263 A.2d 605 (1970).

■ In order to warrant the instruction, appellant was required to produce "some evidence" that the witnesses could have been indicted and punished for the offense as a principal or accessory. *In re Anthony W., supra,* at 274, 879 A.2d 717. To be sure, the burden of proof to generate "some evidence" that Harris and Jones were accomplices to the murder was indisputably upon appellant. *Burroughs v. State,* 88 Md.App. 229, 235, 594 A.2d 625 (1991). Appellant failed to adduce any evidence that would generate an issue as to whether Jones or Harris actually participated in the murder of Taylor, aided or encouraged appellant in the commission of the murder or that they had the intent to kill or harm Taylor and, thus, the trial court did not err in refusing to submit the issue to the jury. We explain.

■ First, as the State points out, even if the jury were to believe all of the contentions appellant raises in his brief, it still could not find that Harris and Jones were accomplices. These contentions only prove that Harris and Jones were present at the murder and did nothing. "It is a universally accepted rule of law that mere presence of a person at the scene of the crime is not of itself sufficient to prove the guilt of that person, even though it is an important element in determination of the guilt of the accused." *Fleming v. State,* 373 Md. 426, 433, 818 A.2d 1117 (2003) (citations omitted). Nothing in the evidence cited by appellant or inferences deducible therefrom supported a finding that Jones and/or Harris aided, encouraged or joined in the commission of the murder.

More importantly, the testimony of both Harris and Jones, which is the only evidence of their involvement, was consistent and refutes appellant's assertion that they possessed the requisite criminal intent or that they participated in the murder. Both testified that they only knew the victim casually and that neither had any conflicts with him. Harris testified that, before the night of the murder, he had never met the victim and did not know his name. He also testified that, when he was walking to the house, he did not know why they were going to the house. Harris admitted giving appellant the

knife, but stated that this was done days before the murder; he gave it to appellant because he did not have any use for it and, when he gave it to him, he did not know that appellant intended to use it to murder Taylor.

Jones testified that he knew Taylor only a "a month or two months" before the murder. When asked to describe his relationship with Taylor, Jones stated, "I didn't know him that well, but I never got into an argument or anything with him." Jones said that, walking to the house, he had an idea of what would happen based on appellant's comments that he was going to "tap" Taylor, but did not know precisely what appellant was going to do. Jones stated that he did not get involved or try to stop it because he was "not trying to get stabbed in the process." Significantly, both Jones and Harris corroborated each other's testimony that the other did not participate in the murder.

Appellant's attempt to introduce "some evidence" that Jones and Harris were accomplices in the murder consisted of questions about their presence at the crime scene, their prior crimes and their inconsistent statements to police. None of this tended to indicate their complicity in the murder of appellant or that they participated, aided or encouraged appellant. Both Jones and Harris were candid in their testimony that they were present during the commission of the murder; however, without more, this is insufficient for them to be accomplices. Additionally, evidence of other crimes charged against or committed by these individuals was not relevant to show that Harris or Jones committed the murder, or helped another commit the murder. Appellant was unable to refute the evidence presented which indicated that Jones and Harris were not accomplices and, instead, could make only accusations and propound unsupported theories that Harris and Jones were accomplices. "Conclusions by non-witnesses are not evidence; arguments are not evidence; theories of complicity are not evidence. The burden of producing legally sufficient evidence cannot be satisfied by offering non-evidence." *Burroughs,* 88 Md.App. at 244, 594 A.2d 625. Ac-

cordingly, the trial court did not err in denying appellant's request for the accomplice liability instruction.

## II

 Appellant's second contention is that the trial court erred in denying his motion to suppress the statements that he made to police during his April 19, 2006 interrogation. As noted *supra*, appellant was interrogated by the police and made statements on two occasions, one on April 12th and a second on April 19th. Between interrogations, the police released appellant from custody. Prior to trial, appellant's counsel sought to suppress both statements.

Neither party disputed that, during each interrogation, appellant was subjected to custodial interrogation and, therefore, *Miranda* warnings were required. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The parties also stipulated that the police provided appellant *Miranda* warnings in both instances. Rather, the issues were whether appellant had invoked his right to counsel under *Miranda* and whether the police had subsequently violated that right.

Regarding the April 12th interrogation, the court viewed the videotape of the interrogation and the court found that appellant clearly and unambiguously requested an attorney based on two statements made by appellant, one in which he asked "so I could call my lawyer to come up here" and another in which he asked "can my lawyer be present?"

So I find that a reasonable police officer in those circumstances would understand this to be a request for an attorney and especially considering the circumstances of this case, that [appellant] was arrested when he was walking into the courthouse accompanied by his lawyer and that he was removed from the courthouse without his lawyer or even given an opportunity to talk to his lawyer or tell the lawyer what had happened.

Now, Detective Childs must have heard [appellant's] statement, that he wanted his cell phone so he could call his

lawyer to come up here, because Detective Childs respond-
ed that, I am going to explain to you what is going on,
instead of allowing the defendant to get his lawyer to come
up and tell him what is going on.

Now, after [appellant's] request for a lawyer, it is true
that Detective Childs read him his *Miranda* rights, and
[appellant] then waived them. However, again, in *Billups*
[*v. State*, 135 Md.App. 345, 762 A.2d 609 (2000) ], the Court
of Special Appeals said, once a defendant requests a lawyer,
subsequent advisement of Constitutional rights followed by
acquiescence in police-initiated questioning can not establish
a valid waiver of the Sixth Amendment right to assistance of
counsel, and the court also reiterated that law in *Costley*
. . . .

. . .

And again, as I mentioned earlier, at the two times these
statements were made, 1346, the interrogation was immi-
nent and, therefore, the right to counsel could be invoked at
the time, and at 1349, with Detective Childs, interrogation
was beginning. It was underway.

So I am going to order that the motion to suppress the
April 12th interview is granted.

Regarding the April 19th interrogation, the court viewed the
video tape, which demonstrated that the police re-adminis-
tered *Miranda* warnings and that appellant thereafter waived
his rights and made inculpatory statements. Appellant ar-
gued that his prior request for counsel prevented the police
from interrogating him a second time without his counsel
present; thus, his waiver was invalid. The court held that his
request for counsel was vitiated by the break in custody
between interviews where appellant was released from custo-
dy and, therefore, his prior request for an attorney did not
prevent the subsequent interrogation. The court further
found that appellant's statements in that interview did not
amount to a request for counsel:

Now, after the April 12th interview, there was a break in
custody. [Appellant] was released from custody on April

12th. He was not charged, because the police wanted to check out his alibi, and he was arrested again a week later on April the 19th.

So according to the law, [appellant's] question-proof status had ended when he was released from custody on April 12th and when [appellant] was taken back into custody on April 19th. He can be informed of his *Miranda* rights and questioned again.

And as to the April 19th statements, my finding is different than on April 12th. I find that on April 19th, [appellant] did not invoke his right to counsel.

. . .

And I find that [appellant] waived his right to counsel on April 19th, knowingly, intelligently and voluntarily, and there was no *Miranda* violation on April 19th. There was no *Miranda* violation on April 19th.[6]

Appellant argues that the trial court erred in holding that the break in custody voided his prior request for an attorney. He postulates that, under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the police could not have conducted the second interview without appellant's counsel; thus, appellant's waiver of his right to counsel in the second interview was invalid. As his waiver was invalid, appellant continues, the second statement should have been suppressed.

The State aptly recognized that the answer to this question is found in the United States Supreme Court decision in *Maryland v. Shatzer*, —— U.S. ——, 130 S.Ct. 1213, —— L.Ed.2d —— (2010), which was pending before the United States Supreme Court at the time the parties filed their brief in this case. Pursuant to the Supreme Court's decision in *Maryland v. Shatzer*, we hold that the trial court erred in denying appellant's motion to suppress and in admitting appellant's April 19th statements into evidence.

---

**6.** At trial, the video of appellant's April 19th statement was played for the jury.

The opinion of the Court of Appeals of Maryland in *Shatzer v. State,* 405 Md. 585, 954 A.2d 1118 (2008), from which the State of Maryland filed and was granted *certiorari* in *Maryland v. Shatzer,* —— U.S. ——, 130 S.Ct. 1213, —— L.Ed.2d —— (2010), set forth the relevant facts of that case:

In August 2003, Brenda Lohman, a social worker assigned to the Child Advocacy Center in the Criminal Investigation Division of the Hagerstown Police Department, made a referral to the police department regarding a child, Michael Shatzer, Jr. The referral involved allegations that appellant, Michael Blaine Shatzer, Sr., committed sexual child abuse by ordering his three-year old son to perform fellatio on him. On August 7, Detective Shane Blankenship met with Shatzer to interview him about the investigation at the Maryland Correctional Institution—Hagerstown, where Shatzer was incarcerated on an unrelated offense involving sexual child abuse of a different child. Shatzer waived his *Miranda* rights, but after Detective Blankenship explained what he wanted to discuss, Shatzer invoked his *Miranda* rights and refused to talk without the presence of an attorney; the interview was terminated. Detective Blankenship's written report stated that "When I [Blankenship] again attempted to initiate the interview, he [Shatzer] told me that he would not talk about this case without having an attorney present."

The police closed the investigation in 2003. In February 2006, Brenda Lohman filed a new referral when the child, now older, was able to make more specific allegations. Sergeant Kifer of the Hagerstown Police Department opened a new investigation. Kifer assigned Detective Paul Hoover to the new investigation because Detective Blankenship was on leave at the time the case was assigned. Shatzer was still incarcerated within the general prison population, and was housed at the Roxbury Institute. Detective Hoover interviewed Shatzer at the Roxbury Institute on March 2, 2006, where Shatzer had been transferred. It is undisputed that Shatzer remained incarcerated in a Maryland Correctional facility during the entire interim period be-

tween the first interrogation in 2003 and the interview by Detective Hoover in 2006.

At the March 2, 2006 interview, Shatzer expressed his surprise at the renewed questioning on the matter involving his son because Shatzer thought that the investigation had been closed. Detective Hoover explained that the Hagerstown Police Department had opened a new investigation on the same matter. Detective Hoover advised Shatzer of his *Miranda* rights and Shatzer signed the waiver form, waiving his right to an attorney and his right to remain silent. At no time did Shatzer indicate that he wished to talk with an attorney. Shatzer denied the fellatio allegation but did admit to masturbating in front of his son, from a distance of about three feet away. At the end of the half hour interview, Shatzer agreed to undergo a polygraph examination. On March 7, 2006, Shatzer was again informed of and waived his *Miranda* rights, and Detective Shawn Schultz administered the polygraph examination. Detective Schultz concluded that Shatzer failed the polygraph test. Detective Hoover then joined Detective Schultz in interviewing Shatzer. Shatzer became emotional, started to cry, and said "I didn't force him. I didn't force him." At that time, he requested an attorney and the interview stopped.

*Id.* at 589–90, 954 A.2d 1118 (footnote omitted).

As a result of his admissions, the State's Attorney for Washington County charged Shatzer with second-degree sexual offense, sexual child abuse and contributing to conditions rendering a child in need of assistance. *Id.* at 590, 954 A.2d 1118. He moved to suppress his March 2006 statements to police, relying on *Edwards* as authority. *Id.* at 591, 954 A.2d 1118. The trial court rejected his contention, stating, *id.:*

"[T]here was a break in custody for *Miranda* purposes because of the length of time that he was incarcerated continuously in the Division of Corrections. And because of that the requirements of *Edwards,* that is, to not question the defendant without having an attorney present once he asserts those rights, did not apply."

Shatzer pleaded not guilty and proceeded on an agreed statement of facts, whereupon the court found him guilty of sexual child abuse. *Id.* The court sentenced him to a consecutive fifteen year sentence, with all but five years suspended, followed by five years of supervised probation. *Id.* at 592, 954 A.2d 1118. Shatzer appealed to this Court and the Court of Appeals, on its own initiative, granted *certiorari. Id.*

The Court of Appeals reversed and remanded the case. After conducting a thorough analysis of Supreme Court precedent, the Court of Appeals held "that the passage of time alone is insufficient to expire the protections afforded by *Edwards." Id.* at 606–07, 954 A.2d 1118. The Court explained, *id.:*

> To hold otherwise would create a tenuous slippery slope, whereby the protections against the coercive pressures of interrogation expire after an indeterminate time period has passed. As the District of Columbia court aptly noted in *Green:* "If five months ... is held sufficient to dispel *Edwards'* presumption that any new waiver of rights is involuntary, then why not three months or three weeks?" *Green,* 592 A.2d at 989. We think that the fact-based analysis such a rule would require would run contrary to the bright-line rule established in *Edwards* and the purpose of *Edwards.* Allowing a lapse of time, standing alone, as the sole factor that terminates the protection against reinterrogation without counsel, would undermine the established rule, that an accused "is not subject to further interrogation" unless either counsel has been made available or "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1885. Without further guidance from the Supreme Court, we adhere to the bright-line rule that without either of these two exceptions, *Edwards* protections continue. *See also Kochutin v. State,* 813 P.2d 298, 304 (Alaska Ct.App.1991), *vacated on other grounds,* 875 P.2d 778 (Ala.App.1994) [ (Alaska App.1994) ] ("we find nothing in *Edwards* or in subsequent decisions of the Su-

preme Court to indicate that *Edwards* should be relaxed by the mere passage of time").

Additionally, the Court held that, even assuming that a break-in-custody exception existed, Shatzer's release into the general prison population was not a break in custody. It reasoned that "a suspect who remains in continuous government custody or incarceration remains in custody for *Edwards* purposes, particularly where, as here, the second interrogation regards the same underlying crime as the first interrogation involved." *Id.* at 607–08, 954 A.2d 1118.

The United States Supreme Court granted *certiorari* to consider "whether a break in custody ends the presumption of involuntariness established in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)." *Maryland v. Shatzer,* —— U.S. ——, 130 S.Ct. 1213, 1217, —— L.Ed.2d —— (2010).[7] First, the court outlined the benefits of the *Edwards* decision, explaining that the presumption of involuntariness of a subsequent waiver of a right to counsel, after the right has been invoked articulated in *Edwards* has the benefits of preserving judicial resources "which would otherwise be expended in making difficult determinations of voluntariness," preserving "the integrity of an accused's choice to communicate with police only through counsel," and preventing "police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Id.* at 1220 (citations omitted). The court noted, however, that a blanket extension of the *Edwards* presumption was unwarranted because, as the rule was extended, the benefits of the presumption would diminish. *Id.*

---

7. The facts of the case presented an additional issue for the Supreme Court of whether an individual, who is released back into general population in a prison, is still "in custody" of the purposes of applying the *Edwards'* protections. The Court held that the "lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda,*" *Id.* at 1224, as compared to those whose continued detention as suspects rested with those controlling their interrogation, and who confronted the uncertainties of what final charges they would face, whether they would be convicted, and what sentence they would receive. *Id.* at 1225.

at 1221. For example, there are instances where a suspect who has invoked his *Miranda* right to an attorney is released from pre-trial custody and, after returning to his normal life, decides to cooperate without an attorney. *Id.* Under these circumstances, the court reasoned, the "[u]ncritical extension of *Edwards* . . . would not significantly increase the number of coerced confessions excluded"; thus, the justification for the rule would decrease in relation to its expansion. *Id.* Besides yielding diminishing benefits, the Court pointed out that the wholesale extension of *Edwards* would have associated costs, such as "the in-fact voluntary confessions it excludes from trial, and the voluntary confessions it deters law enforcement officers from even trying to obtain." *Id.* at 1222. Accordingly, the Court stated that *Edwards* must be deemed to have an ending point after the "termination of *Miranda* custody and any of its lingering affects." *Id.*

The issue for the Court then became determining the duration of the break in custody that would eliminate the lingering affects of *Miranda* custody. *Id.* at 1222–23. In answering this question, the Court took the unusual step of delineating a precise time limit for which the *Edwards* protections will apply after a break in custody. The Court deemed it "appropriate to specify a period of time to avoid the consequence that continuation of the *Edwards* presumption 'will not reach the correct result most of the time.'" *Id.* at 1223. (quoting *Coleman v. Thompson,* 501 U.S. 722, 737, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). Thus, the Court held that a break in custody sufficient to eliminate the *Edwards* presumption is fourteen days. *Id.* Explaining how the new bright-line rule will work, the Supreme Court declared:

> In every case involving *Edwards,* the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress. Now, in cases where there is an alleged break in custody, they simply have to repeat the inquiry for the time between the initial invocation and reinterrogation. In most cases that determination will be easy. And when it is determined that the defendant pleading *Edwards* has been

out of custody for two weeks before the contested interrogation, the court is spared the fact-intensive inquiry into whether he ever, anywhere, asserted his *Miranda* right to counsel.

*Id.* at 1223–24. According to the Court, fourteen days "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.* at 1223.

Applying the fourteen day *Shatzer* standard to the case at bar, it is clear that, while appellant had a break in custody, the break in custody lasted a mere seven days—a full week short of the requirement of *Shatzer.* The Supreme Court's holding mandates the suppression of appellant's April 19, 2006 statement; thus, the trial court erred in denying appellant's motion to suppress the statement and in admitting the evidence of that statement at trial over appellant's objections. The introduction of appellant's statement violated his Fifth Amendment right against self-incrimination and, given the prominent role the statements played in the State's case in chief, as well as the State's closing argument, discussed *infra,* Part VI, the admission of appellant's statements cannot be adjudged harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976). Accordingly, his conviction must be vacated and the case remanded for a new trial.

## III

Even though we remand the case *sub judice* for a new trial based on the State's introduction of inadmissible statements made by appellant, the remaining issues that appellant raises have a likelihood of recurring on remand and, therefore, we shall address them for the guidance of the court on remand. Appellant's third contention is closely related to his second. He asserts that the trial court erred in denying his motion to suppress the evidence derived from his April 12th

statements to the police and in admitting the evidence over his objection at trial.

After appellant's initial statement to the police was suppressed due to the failure of the police to provide counsel before resuming their interrogation on May 5, 2008, appellant argued his motion *in limine* regarding evidence that the police had obtained as a result of statements appellant made during his initial interview. Specifically, this evidence included video surveillance of appellant, Jones and Harris at Wendy's restaurant, still photographs that were made from the surveillance video and cell phone records which were obtained as a result of statements appellant made during the initial interview.

Appellant's counsel argued that, under the "fruit of the poisonous tree" doctrine, the evidence obtained from appellant's statements, which the court held were inadmissible, should likewise be excluded. The court, citing *Raras v. State,* 140 Md.App. 132, 780 A.2d 322 (2001), ruled that derivative evidence obtained from a *Miranda* violation was only inadmissible if the defendant's statements were coerced and, because the court found that the statements in this case were otherwise voluntary, the evidence was admissible. Appellant's counsel asserted that *Raras* and the authorities cited therein were distinguishable because the derivative evidence obtained in those cases was the result of statements made when the police had failed to provide the defendant with *Miranda* warnings. By contrast, appellant's counsel explained, appellant had been given *Miranda* rights, but the statements that he made were made after the police ignored his request for counsel.

The State agreed with the court that the *Raras* case was directly on point and, citing *United States v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) and *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), asserted that the law did not require that the derivative evidence be suppressed.

Thereafter, the circuit court made its ruling:

I think that the case of *Raras* [*v. State*, 140 Md.App. 132, 780 A.2d 322 (2001) ] does address this question and that the law is actually very clear that the failure to provide *Miranda* warnings does not necessarily preclude introduction of derivative evidence, rather evidence [is] inadmissible when it is—from what is derived is coerced.

I've already found the statement was not coerced. We have a voluntary statement by the Defendant.

That does not preclude the introduction of any other evidence gained from further investigation by the police, that there's been nothing offered by the Defendant that would suggest or cause the Court to preclude any further evidence derived from the first interview.

. . . [S]o the motion is denied as to derivative evidence.

At trial, as the evidence was offered, considered and admitted, appellant's counsel noted several objections and continuing objections.

In this appeal, appellant reiterates his argument from the motion *in limine* and asserts that, because his April 12th statement to the police was inadmissible as a result of the failure of the police to provide counsel when requested, the evidence derived from statements made during that interview is similarly inadmissible as the "fruit of the poisonous tree." He cites *United States v. Gilkeson,* 431 F.Supp.2d 270 (N.D.N.Y.2006) as one of the "better-reasoned authorities" that recognizes the distinction between a "mere *Miranda* violation" and an *Edwards* violation. He posits that the situation where the police do not honor a suspect's election to deal with the police only through counsel is sufficiently different from those where police do not provide *Miranda* rights at all. We disagree. Our holding in *Raras v. State,* as we see it, is controlling and appellant's citation to non-controlling authority from a United States District Court is unpersuasive, especially in light of the Supreme Court's decision in *United States v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).

In *Raras v. State,* we were asked to determine whether the trial court erred in denying Raras's motion to suppress "the fruit of the interrogation of another suspect conducted in violation of *Miranda.*" 140 Md.App. at 141, 780 A.2d 322. On November 14, 1998, a woman was brutally murdered in her home in Howard County. *Id.* The police had no suspects until the summer of 1999, when they received information that an inmate in the Baltimore County Detention Center, Ardale Tickles, had confessed to committing the crime to another inmate. *Id.* at 141–42, 780 A.2d 322. The police arrested Tickles and, as they commenced the interrogation, Tickles requested an attorney. *Id.* at 142, 780 A.2d 322. The police ignored his request and continued to question him until he made statements incriminating himself and Raras. *Id.* After Raras was arrested, she also made inculpatory statements to the police. *Id.* at 142–51, 780 A.2d 322.

Raras moved to suppress her statements on several grounds. *Id.* at 152, 780 A.2d 322. One of the grounds was that "her own statement was the fruit of the improper interrogation of Tickles and therefore should have been suppressed." *Id.* at 164, 780 A.2d 322. The trial court denied her motion and, after she was convicted, she appealed. *Id.* at 151, 780 A.2d 322. We noted that addressing this argument was unnecessary because Raras lacked standing to raise it; however, we continued, assuming, *arguendo,* that she had standing, we would affirm the trial court's decision to deny the motion to suppress. *Id.* at 165, 780 A.2d 322. The Supreme Court, in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), we observed, had "refused to apply the fruit of the poisonous tree doctrine ... to suppress a second statement made by a suspect who had properly been advised under *Miranda* before making that statement but who had made an earlier statement prior to any advice of rights." *Id.* at 166, 780 A.2d 322. We explained

> that a failure to provide the *Miranda* warning does not necessarily preclude the introduction of derivative evidence. Rather, that evidence is inadmissible only if the confession from which it was derived was coerced.... Obtaining a

confession in violation of the *Miranda* rule does not automatically destroy the admissibility of evidence discovered by using the unwarned confession.

As Raras failed to allege that Tickles's statement was involuntary, we declined to extend the fruit of the poisonous tree argument. *Id.*

We view our statements in *Raras* to be controlling in the case *sub judice.* The factual patterns are virtually identical. Raras asserted that her statements were inadmissible as the fruits of statements made after the police had ignored Tickles request for an attorney. Appellant argued, as appellant argues here, that the evidence introduced against him was the fruit of a statement made after police had disregarded his request for an attorney. The issue raised by appellant is indistinguishable from that raised in *Shatzer.* Moreover, even assuming appellant's case were distinguishable, as appellant suggests, *i.e.,* that Tickles' statements were made without *Miranda* warnings, we discern no justifiable reason to distinguish voluntary statements that are made in violation of *Miranda* rights from voluntary statements that are made before *Miranda* warnings are given. *United States v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) is instructive regarding the distinction.

In *Patane,* the defendant was arrested for harassing his ex-girlfriend, but was released on bond, subject to a restraining order. *Id.* at 634, 124 S.Ct. 2620. While investigating the harassment, the police were notified that the defendant illegally possessed a handgun. *Id.* Two officers responded to the defendant's home and arrested him for violating the restraining order. *Id.* at 635, 124 S.Ct. 2620. The officers attempted to advise him of his *Miranda* rights; however, the defendant indicated that the officers should discontinue their advisement, insisting that he knew his rights. *Id.* The officers never finished advising the defendant of his rights. *Id.* Thereafter, the detectives questioned the defendant about the weapon and, although initially reluctant, the defendant ultimately told the detectives where the gun was located in his home. *Id.*

After he was indicted by a grand jury on weapons charges, the District Court granted his motion to suppress the firearm on the basis that the officers lacked probable cause to arrest the defendant. *Id.* The District Court did not rule on appellant's alternative argument that the gun should be suppressed as the fruit of an unwarned statement. *Id.* The United States Court of Appeals reversed the District Court with respect to the issue of probable cause but, nonetheless, affirmed the motion to suppress on the basis of the defendant's "fruit of the poisonous tree" argument. *Id.* at 635–36, 124 S.Ct. 2620.

The Supreme Court granted certiorari to determine "whether the failure to give a suspect the warnings prescribed by [*Miranda*] requires the suppression of physical fruits of the suspect's unwarned but voluntary statements." *Id.* at 633–34, 124 S.Ct. 2620. Ultimately, a plurality of the Court ruled that the fruit of the poisonous tree doctrine "is not implicated by the introduction at trial of physical evidence resulting from voluntary statements[.]" *Id.* at 634, 124 S.Ct. 2620. In reaching this conclusion, the Court sought to "maintain the closest possible fit" between the Self–Incrimination Clause and the *Miranda* Rule and emphasized that the *Miranda* rule exists to protect a suspect's right against compelled testimonial self-incrimination. *Id.* at 643, 124 S.Ct. 2620.

The Court's analysis focused on the core protection of the Self–Incrimination Clause of the Fifth Amendment, which it stated was the "prohibition on compelling a criminal defendant *to testify* against himself at trial." *Id.* at 637, 124 S.Ct. 2620 (emphasis added). Focusing on this testimonial protection, the Court held that "[t]he Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." *Id.* Protecting this privilege against testimonial self-incrimination, the Court noted, is the impetus for formulating prophylactic rules such as *Miranda;* however, in furtherance of this goal, these rules "necessarily sweep beyond the actual protections of the *Self–Incrimination Clause* [and] any further extension of these rules must be justified by its necessity for the protection of the actual right against compelled self-incrimination." *Id.* at 639, 124 S.Ct.

2620. The Court explained that, it is for this reason that statements that are voluntary, but taken without *Miranda* warnings, may still be used to impeach a defendant's testimony at trial, while compelled statements and their fruits may not. *Id.* (citing *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979)). The Court noted that its decision in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), in which it characterized *Miranda* to be a "constitutional rule," did not affect its observations because, in the end, the focus of the *Miranda* rule is on the continued protections of the Self–Incrimination Clause, which deals with testimony, and *Dickerson's* characterization of *Miranda* as a constitutional rule does not lessen the need to maintain the closest possible fit between the Self–Incrimination Clause and any rule designed to protect it. *Id.* at 640–41, 124 S.Ct. 2620.

Turning to the issue at hand, the Court reasoned that the mere failure to give *Miranda* warnings, does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule. *Id.* at 641, 124 S.Ct. 2620. As *Miranda* was promulgated as a prophylactic protection of the Self–Incrimination Clause, violations of a defendant's constitutional rights only occur "upon the admission of unwarned statements into evidence at trial." *Id.* This is because, in the end, the Self–Incrimination Clause, which *Miranda* is designed to protect, is a trial right. *Id.* The Court explained:

It follows that police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda.* Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, "[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy" for any perceived *Miranda* violation. *Chavez, supra,* at 790, 123 S.Ct. 1994, 155 L.Ed.2d 984.

*Id.* at 641–42, 124 S.Ct. 2620 (citing *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003)).

The Court rejected the proposition endorsed by the United States Court of Appeals that "the taking of unwarned statements violates a suspect's constitutional rights." *Id.* at 642, 124 S.Ct. 2620.

[i]ntroduction of the nontestimonial fruit of a voluntary statement, such as respondent's Glock, does not implicate the Self–Incrimination Clause. The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial. In any case, "[t]he exclusion of unwarned statements ... is a complete and sufficient remedy" for any perceived *Miranda* violation. *Chavez, supra,* at 790, 123 S.Ct. 1994, 155 L.Ed.2d 984 (Kennedy, J., concurring in part and dissenting in part). *See also* H. Friendly, Benchmarks 280–281 (1967). There is simply no need to extend (and therefore no justification for extending) the prophylactic rule of *Miranda* to this context.

*Id.* at 643, 124 S.Ct. 2620.

In conclusion, the Court explained that the word "witness" in the Self–Incrimination Clause "limits the scope of that clause to testimonial evidence." *Id.* at 643–44, 124 S.Ct. 2620. Thus, it was the Constitution itself, not the Court, that limited the scope of evidence that, if admitted, would violate a defendant's Fifth Amendment right. *Id.* at 644, 124 S.Ct. 2620. The Court also distinguished the situation before it from those where it has held that fruits of coerced statements are inadmissible, explaining that

it must be remembered that statements taken without sufficient *Miranda* warnings are presumed to have been coerced only for certain purposes and then only when necessary to protect the privilege against self-incrimination. *See* Part II, *supra.* For the reasons discussed above, we decline to extend that presumption further.

*Id.*

The clear significance of the Supreme Court's decision regarding derivative, or "fruits," evidence is that such evidence is only inadmissible when the statements from which it

was derived were coerced or involuntary for reasons other than a *Miranda* violation. Thus, based on the trial court's findings that appellant's statements were inadmissible because the police obtained them after he made an unambiguous request for an attorney, but that the statements were otherwise voluntary, we are constrained to hold that the court's decision to admit the derivative evidence was not erroneous. It is clear from the Supreme Court's holding in *Patane* that only evidence derived from compelled statements is inadmissible, but the "fruits" of statements that are voluntary, but otherwise violate *Miranda*, are admissible. Accordingly, *Miranda* and *Edwards* do not require that the fruits of appellant's statements be suppressed and the trial court did not err in admitting the evidence.

## IV

Appellant next argues that the trial court erred in permitting a lay witness to present expert testimony concerning cell phone records and cell phone technology.

Prior to trial, appellant filed a motion *in limine* seeking to preclude Detective Childs from testifying as to the manner in which the records of appellant's cell phone were utilized to establish appellant's location at times before, during and after the murder. It was appellant's contention that such evidence required expert testimony and that Detective Childs was not an expert. The trial court denied the motion *in limine.*

At trial, when Detective Childs was called, appellant again objected to the detective testifying to appellant's location based on information obtained from cell phone records and tower locations. Appellant's counsel stated that he believed that Detective Childs would testify as to his conclusions about the direction of the phone calls and, by looking at the records, determine from where the call originated "in terms of geography." He objected that the State had not qualified him as an expert and that the State indicated that Detective Childs would not be providing any expert evidence. In the court's view, Detective Childs was not offering expert testimony

because "the record tells them the location of the tower and the side of the tower that they're [sic] hit." The State proffered that "it is certainly testimony as to his opinion and conclusions as to the direction of the call." The court overruled appellant's objection, stating,

[h]e testified you can tell from the records the side of the tower that they're [sic] hit and the cell phone, if I recall his testimony, that is consistent with the direction from which the call was originated, where you can say the direction from which the call was originated. That's what he said he can tell from the records.

So if you want to get into all that foundation, you can certainly do that. But he has said in the past he can do that from the records.

The trial court then permitted Detective Childs to explain the process of cell phone tracking, over appellant's objection, for the jury:

The significant things that we're interested in are these two columns, also the two columns of numbers.

Okay. The first column, big column is originated cell site.

Your phone is always active. It's always hitting a tower. It's hitting on a line other than what you talk on. Okay. It's transmitting all the time. So that when you go to make a call, it's already on a tower. It's called a transmission. It locks in on a tower. And that's where you're originating your call from.

So if you pick up your phone now, everybody, even though we're inside a building, even if your strength might not be strong in a building, you are still on a tower. When we make a call, the company records use a tower to originate your call.

Now, if you move or you go even as much as just across the room to window where your power to another tower may be stronger, you're going to switch towers.

. . .

The two numbers, looking at this column, 2448, that's what's called a location or LAC. That's the area that a

group of cell towers are located in, say just for example, Randallstown, Pikesville, Towson, Catonsville. That "2448" designates the region of the market for that phone company.

. . .

The group—you have numbers—here's the five group of numbers, the second column of numbers is what we call the ACGID number. The number contains the identification number of that particular tower and the side of the tower.

The number—the last number on this particular carrier two just indicates the cell phone was hitting that side of the tower.

Most towers are configured in a triangle.

When Detective Childs was asked to state the qualifications that enabled him to decipher the cell phone records, tower locations and location from which calls were made, he stated:

I attended a school for cell phone analysis, a two-day school. I attended it. And I've been doing this—as well as then talking to engineers to the carriers, to our tech guys, reviewing cell phone records for a number of years in regards to our investigations.

Thereafter, Detective Childs testified that the cell phone records were obtained from appellant's phones, pointing out on the records various phone calls that were made around the time of the murder and producing a map upon which he had located various cell phone towers near the location of the murder. Referring to the map, he testified that, based on the cell phone records and the towers upon which appellant's cell phone signal hit and upon which sides of those towers that were hit, he could determine that appellant's phone records were consistent with his presence in the vicinity of the murder around the time the murder happened. He also explained that the cell phone records from Hill's phone were consistent with his stated location at the time of the murder.

Appellant contends that the trial court erred in overruling his objection because Detective Childs was not a disclosed and qualified expert and he rendered opinions on a topic that was

beyond the purview of the ordinary lay juror.[8] Citing *Ragland v. State*, 385 Md. 706, 870 A.2d 609 (2005), appellant acknowledges that many people are familiar with cell phones generally, but states that the average person "is likely to know little or nothing about the records maintained by service providers or the technology that permits an individual phone to function in conjunction with the nearest side of the nearest (or in some cases, as the detective testified, strongest) tower." Appellant asserts that such knowledge can only be gained by training and experience, neither of which Detective Childs possessed. We agree.

Judge Sharer, writing for this Court in our recent decision in *Wilder v. State*, 191 Md.App. 319, 991 A.2d 172 (2010) decided the issue of whether cell phone tracking technology is admissible without expert testimony. In that case, we concluded that a "trial court abused its discretion by permitting testimony about cellular tower site location without qualifying the State's witness as an expert. . . ." *Id.* at 327, 991 A.2d 172. In *Wilder*, a shooting occurred in Baltimore County and the police arrested Wilder as a suspect. *Id.* at 327–28, 991 A.2d 172. The police recovered two cell phones from Wilder at the time of his arrest and, using records from those phones, they tracked his movements from the time of the shooting until his arrest by locating the cell phone towers from which Wilder's phone had received a signal. *Id.* at 348, 991 A.2d 172.

Prior to trial, Wilder sought to exclude testimony about how police tracked his movements at the time of the shootings, contending that an expert was required to testify " 'where the towers are located, how close the towers are, how a phone

---

**8.** Rule 5–702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

pings off a certain tower compared to one or two miles away. . . .' " *Id.* at 350, 991 A.2d 172. Wilder did not challenge the reliability of the evidence, but he asserted that the locations and the explanation and interpretation of the cell phone records requires the presentation of expert testimony. *Id.* at 347, 991 A.2d 172. Wilder argued that the State had to present that evidence through an expert witness rather than the lay testimony of a detective. *Id.* at 348, 991 A.2d 172. The State assured the court that the detective was not going to render any opinion, but instead was just explaining records. *Id.* at 351, 991 A.2d 172. The State did stipulate that the detective was not an expert. *Id.*

During the trial, the detective testified that he utilized cellular phone tracking to determine that Wilder was in the vicinity of the shooting. *Id.* at 356, 991 A.2d 172. He explained that his experience with utilizing cell phone records was the result of his use of these records in twenty-five cases and his training was a certification from the cell phone company. *Id.* at 356, 991 A.2d 172. He explained that the police obtained Wilder's cell phone number and that this was useful for "finding out a lot about a person through GPS or cell tower hits." *Id.* at 354, 991 A.2d 172. The detective also stated that the cell tower received hits from Wilder's cell phone and explained how they used that information to track Wilder. *Id.* at 356–61, 991 A.2d 172. Specifically, the detective discussed the cell phone records that were coded to identify "originating and terminating cellular phone tower sites." *Id.* at 358, 991 A.2d 172. The following colloquy occurred:

Q. Okay. Can you please explain to the jury what information is on this particular page of the records, the first page?

A. Okay. Well, they're kinda coded at the top. Some of them don't make a whole lot of sense. But the first column is actually the target number, or in this case one of the cell phones he was using.

\* \* \*

A. The second column is the date of when the call took place.

The third column—third column is the call initiation time, or when the call started.

The fourth column is the duration of the call in seconds. That actually will pick up—whether someone picks up the phone or not, it still records from the time you hit the talk button on your cell phone.

The type of call is the next column. It just simply says inbound or outbound, meaning outbound meaning he made—or the person using this phone made the call, and inbound meaning somebody called the phone.

* * *

And then the following two columns are the coded originating and terminating cellular phone tower sites. It starts with originating and ending and terminating. Those columns sometimes have the same exact information in them and other times they—the 24 towers will be different in each column.

Q. Okay. And the—what is it that actually appears in these two columns, originating cell site and terminating cell site? What is all of that—what are all of those letters and numbers?

A. It's basically the code—for whatever reason, they decide to use a code of some sort at Nextel Sprint that doesn't [*50] mean anything to anybody unless you have—unless you ask them or you look at a spreadsheet of what this code means.

And it basically correlates to latitude/longitude, and they even actually sometimes label a cell site tower with an address and things like that.

Q. Okay. Do you have access to the spreadsheet that converts these codes to longitude and latitude?

A. Yes.

Q. Okay. And if you have that, what can you do?

A. Well, once I figure out that this code means a certain latitude/longitude then I just simply—using that Microsoft Streets and Trips program, you search for that latitude/longitude, and it pinpoints it on the map.

Q. Okay. And did you do that in this case?

A. Yes.

Q. And did you create a map?

A. Yes, I did.

*Id.* at 357–359, 991 A.2d 172.

The detective also provided a map and explained how he correlated the locations of the towers

"with the phone call—or the phone number associated with that tower hit; the direction of the call, meaning the outbound or inbound; the time of the call; and the duration of the call in seconds. All that information's on the map. The map's also numbered in chronological order from the time I have the first bit of information, which I believe starts at 4:29 a.m. on July 25th, and ends on the same date at 5:55 a.m."

*Id.*

Wilder was convicted and appealed to this Court. He asserted that the admission of the testimony " 'contradicts the holding of *Ragland v. State,* 385 Md. 706, 870 A.2d 609 (2005)' '" and that " '[a]n expert from the cell phone company or an engineer familiar with cell phone technology would have been the proper person to testify as to those matters.' " *Id.* at 362, 991 A.2d 172. Despite recognizing "authority permitting the lay testimony of a police officer with respect to cell site location[,]" we held that "the use of cell phone site location evidence and the accompanying testimony of a law enforcement officer who explained its use required the qualification of the sponsoring witness as an expert[.]" *Id.* at 364, 991 A.2d 172. Taking into account the Court of Appeals' decision in *Ragland,* we stated that "the better approach is to require the prosecution to offer expert testimony to explain the functions of cell phone towers, derivative tracking, and the techniques of locating and/or plotting the origins of cell phone calls using cell phone records." *Id.* at 365, 991 A.2d 172.

Recognizing that basic cell phone bills are items that, in some instances, may be within the purview of the lay juror, we

observed that the detective's testimony "implicated much more[.]" *Id.* at 368, 991 A.2d 172. By using the records of calls "to plot location data on a map and to convert information from the cellular phone records in order to plot the locations from which Wilder used his cell phone[,]" the detective utilized a procedure that required "some specialized knowledge or skill ... that is not in the possession of the jurors." *Id.* (citing *Ragland,* 385 Md. at 720, 870 A.2d 609). As a result, because his testimony was based on special training, we concluded that he was required to be qualified as an expert and, as such, the State was, accordingly, also required to fulfill its discovery obligations under Md. Rule 4–263(b)(4). *Id.*

Patently, the testimony of Detective Childs is equivalent with that of the detective in Wilder. Similar to the detective in *Wilder,* utilizing the data from the cell phone records, Detective Childs rendered an opinion on appellant's location at the time of the calls, stating that the phone records were consistent with appellant's presence in the vicinity of the murder around the time it happened. From the cell phone records, he testified that he was able to determine whether the location of individuals was consistent with their statements to police and their testimony. Neither Detective Childs nor the detective in *Wilder* were qualified as experts, but rather, stated that their training was the result of certification from the cell phone company. Under our holding in *Wilder,* it was clearly error for the court to admit this evidence without expert testimony. On remand, this evidence may only be introduced through a witness qualified as an expert.

## V

██ Appellant's fifth contention is that the trial court abused its discretion in restricting his cross-examination of Shamar Harris. During his direct testimony, the State asked Harris if, since the murder, he had "been in trouble with the law or ... been convicted of a crime." Harris responded "Yes" and, when asked what was the crime, he stated "Handgun violation, attempted armed robbery." During his cross-

examination of Harris, appellant's counsel attempted to elicit testimony from Harris about these crimes. When counsel sought to inquire further, the State objected. During the bench conference, appellant's counsel indicated that he was attempting to ask Harris whether he was charged with carrying a deadly weapon with intent to injure on Christmas Eve of 2006, eight months after the murder. The State proffered that the basis of its objection was that Harris was never convicted of that charge. Appellant's counsel responded that it was not a question of "impeachables or convictions" because the State had opened the door. Appellant's counsel further asserted that he had a right to ask Harris about it because

the protection of a Defendant for prior bad acts and prior conduct is not afforded to a witness when the witness says my good conduct is the reason I was scared. He is also right there at the scene of the crime. I think I'm entitled to let the jury know about his background and experience with weapons.

The State countered that the witness could not be impeached by a subsequent charge, to which appellant's counsel responded:

I agree with the State if the reason I'm offering this was to show a criminal record to impeach his credibility, but what the State has put into evidence is that since this crime—they asked the direct question. Since this crime he has been convicted of two crimes, armed robbery and use of handgun. As a matter of fact, he was not convicted of armed robbery. That was not a conviction, that's what he was charged with. Then the jury is left with the impression that maybe he has only been charged with two crimes since this has happened.

The court sustained the objection, explaining that, "if you are trying to impeach him that he has never been in this situation before and that's the reason he never told the detectives about the knife, I don't know how the subsequent charge is germane or impeaches that statement that he had never been in this situation before the day of the murder."

Appellant's counsel agreed, stating, "I agree with the Court on that"; however, he clarified

My reason for asking is to show whether or not this witness has a propensity for violence because he was at the scene of the crime, and he was an eyewitness that had nothing to do with what happened.

Because Harris had never been convicted, rejoined the prosecutors, asking him about the charge is not appropriate to impeach him. According to appellant's counsel, he had a right to bring before the jury evidence that Harris had a propensity for violence in order to create a reasonable doubt as to how the murder occurred, *i.e.*, that Harris did not merely witness the murder, but was, in fact, a participant. The court again sustained the objection.

Appellant argues on appeal that, in *Sessoms v. State*, 357 Md. 274, 744 A.2d 9 (2000), the Court of Appeals held that prior misconduct of a witness is a permissible subject of inquiry on cross-examination and is not precluded by Md. Rule 5–404(b). He asserts that his questioning of Harris was governed by the general rule of relevancy, Md. Rule 5–403, and that the evidence here was relevant because "[t]he fact that Harris was in possession of a deadly weapon some eight months after the day in question clearly makes it more likely he would have employed a deadly weapon against Taylor, and therefore less likely that Appellant did so."

The State counters that the basis of the court's ruling was that the evidence was inadmissible under Md. Rule 5–405 and that this ruling was proper.[9] The State posits that, while Rule 5–405 allows inquiry into "specific instances of conduct," appellant did not know the facts underlying the charge at issue and, therefore, it does not constitute relevant conduct. Finally, concerning appellant's contention that Harris's charge made it

9. The State raises an additional issue of whether appellant waived any argument on this point. We need not determine whether this issue is waived because we are simply commenting on it for the benefit of the parties and the court on remand.

more likely that he committed the crime, the State contends that such a conclusion calls for "rank speculation."

Initially, notwithstanding the State's assertion to the contrary, it is clear from the record that the basis of the court's ruling on the objection was not Md. Rule 5–405, but Md. Rule 5–404, regarding other crimes, wrongs, or acts. Appellant's counsel unequivocally explained his reason for seeking to introduce the evidence, to prove Harris's propensity for violence, and it was based on this reason that the court sustained the objection. Maryland Rule 5–404(b) states that

> (b) Other crimes, wrongs, or acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

In *Sessoms,* 357 Md. 274, 744 A.2d 9, the Court of Appeals held that Md. Rule 5–404(b) is applicable only to the defendant and that evidence of other crimes, wrongs or acts may be admitted against a witness. *Id.* at 287, 744 A.2d 9. The Court of Appeals stated, "[e]vidence of a witness's past bad behavior, when the witness is not the defendant, does not imply that the defendant possesses a propensity to commit a specific type of crime." *Id.* The risks to the defendant are absent when the defendant is offering such evidence against a witness or other third party in an attempt to prove facts pertinent to a defense. *Id.* at 288, 744 A.2d 9. Thus, the evidence was not rendered inadmissible by Md. Rule 5–404(b).

Merely because Md. Rule 5–404(b) did not preclude appellant's counsel from questioning Harris about his other wrongs or criminal acts does not necessarily mean that the evidence was automatically admissible. The issue then becomes "whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense." *Sessoms,* 357 Md. at 288, 744 A.2d 9. This is an issue that we will not address on appeal because the issue of relevancy is

committed "to the considerable and sound discretion of the trial court." *Fenner v. State*, 381 Md. 1, 25, 846 A.2d 1020 (2004) (citing *Merzbacher v. State*, 346 Md. 391, 404–05, 697 A.2d 432 (1997)). It is evident that the trial court did not rule on the relevancy of the evidence, but instead held it inadmissible under Md. Rule 5–404(b); we, accordingly, will not comment on whether the evidence is relevant. We simply note that such a determination will need to be made if the issue arises on remand.

## VI

Appellant's final contention is that the trial court erred in allowing the State to make impermissible statements in its argument and rebuttal arguments. Appellant asserts that, in two instances, the State made comments regarding appellant's statements to the police, or lack thereof, which had a "tendency to shift the burden of proof to the defense, and/or to exploit [a]ppellant's constitutionally protected and evidentially irrelevant silence on the point at issue."

The first statement was made by the prosecutor during her closing argument. The State played excerpts from appellant's statements to Detective Childs and focused upon the matters that appellant failed to tell the Detective:

(WHEREUPON, video of [appellant] was played.)

"I went straight over to Alicia's house, played video games and watched a movie." *I forgot to tell you that I talked to Corey telling him it was a bloody mess. Oh yeah, I forgot to tell you that Dwayne and I had about 18 conversations from just about three o'clock in the morning.*

(WHEREUPON, video of [appellant] resumed.)

Detective Childs gave Nick Jones an opportunity to tell what happened. Nick Jones told what happened. He gave Shamar Harris an opportunity to tell what happened, and Shamar Harris told the exact same story. *He gave the Defendant the opportunity to tell what happened,* and the

Defendant says he was not there, and Defendant was not there because he was with Nick Jones at Alicia's.

(Emphasis added).

The second statement appellant references occurred during the prosecutor's rebuttal argument. During her rebuttal closing argument, she highlighted appellant's failure, during his interrogations by police, to explain or to mention evidence that was inculpatory. The Assistant State's Attorney commented:

[The State]: How does he explain the twenty chirps between he and Dwayne while they are allegedly watching the entire Scarface movie? You will see on the DVD he is adamant about saying they watched the entire movie and were playing video games. Yet it is three a.m., and there is at least 20 chirps between he and Dwayne. *He doesn't mention that any where in his statement to Detective Childs about what he is doing on the night of the murder.*

[Appellant's Counsel]: Objection.

The Court: Overruled.

(emphasis added).

Notwithstanding appellant's arguments, we decline to address the merits of this issue as it will not recur on remand. The State's closing argument clearly referenced appellant's April 19th statement, which, as we stated *supra*, Part II, is inadmissible. Accordingly, the Assistant State's Attorney is not at liberty to comment on appellant's statements to police in closing argument during further proceedings on remand.

**JUDGMENT OF CONVICTION FOR FIRST–DEGREE MURDER VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL.**

**COSTS TO BE PAID BY BALTIMORE COUNTY.**